**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  LKG-24-329** |
| | : | |
| **MACK LEE CLECKLEY, III** | : | |
| | : | |
| **Defendant.** | : | |

---

## MOTION TO SUPPRESS AND REQUEST FOR *FRANKS* HEARING

Defendant Mack Lee Cleckley, III ("Mr. Cleckley"), by and through his counsel, John M. McKenna, and Brennan, McKenna & Lawlor, Chtd., respectfully submits the following Motion to Suppress and Request for *Franks* Hearing. Mr. Cleckley moves to suppress the fruits of the April 30, 2024 arrest, search, and seizure of his person conducted by members of the Charles County Sherrif's Office, the United States Marshals Service, and the Prince George's County Police Department. Mr. Cleckley also moves to suppress the fruits of the April 30, 2024 searches of Room 54 of the Bragg Motel in Upper Marlboro, Maryland. In particular, Mr. Cleckley challenges the initial warrantless searches of the hotel room as well as the subsequent search conducted pursuant to a warrant issued several hours later. Mr. Cleckley further moves to suppress the fruits of the searches of two iPhones seized from Room 54 and his  Nissan automobile that was parked outside of the Bragg Motel. Finally, as to the search warrants at issue in this case, Mr. Cleckley respectfully requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

1

I.      **Factual and Procedural Background**

A.      **December 2022 – Red Carpet Inn Investigation**

The events that gave rise to this case date back to December 2022. At approximately 9 a.m. on December 17, 2022, staff at the Red Carpet Inn in Indian Head, Charles County, Maryland called the Charles County Sherrif's Office (CCSO) and reported that hotel cleaning staff had located suspected drugs inside of Room 217. Officers Wedding and Gustafson of CCSO responded to the hotel. Staff members informed the officers that they believed that the occupant of the room had been due to check out on December 16, 2022 by 11 a.m. but had failed to do so. Staff members further informed the officers that they attempted to contact the occupant using a phone number the occupant provided at the time of checking in and that those attempts were unsuccessful. Staff members also informed the officers that when cleaning staff entered the room, they found a bag containing what they believed were drugs.[1] Staff members ultimately placed the bag and the items that were inside of it on the bed of the hotel room and called the authorities. On the basis of the materials provided in discovery, it does not appear that the officers reviewed any records associated with the rental of the hotel room before deciding to enter the room without a search warrant. Officer Gustafson entered Room 217 and claims to have observed suspected marijuana as well as a white rock-like substance during the warrantless search of the hotel room. The officers then contacted the CCSO Narcotics Enforcement Section and decided to seek a warrant to search the hotel room.

At 11:35 a.m. that same morning, Detective Casey Phillips of CCSO applied for a warrant to search Room 217 of the Red Carpet Inn. At 11:43 a.m., Judge Carrington-Martin of the Circuit Court for Charles County signed the warrant. The affidavit in support of the search warrant

---

[1] Mr. Cleckley was not present at the hotel on December 17, 2022.

contains *no information* connecting Mr. Cleckley to Room 217. Inside of the hotel room, officers found suspected marijuana, suspected eutylone[2], alleged packaging materials, a cell phone, and mail in names other than Mr. Cleckley's.[3] After obtaining the search warrant, Det. Phillips spoke with Perry Patel, the owner of the hotel. Mr. Patel provided Det. Phillips with a photocopy of Mr. Cleckley's unexpired District of Columbia driver's license – the driver's license used to rent the room. Det. Phillips also obtained an invoice for the room rental. Notably, the invoice reflects that Mack Cleckley rented Room 217 for two adult guests using a valid driver's license. The invoice reflects a "Date In" of December 14, 2022 at 11:03 a.m., and a "Date Out" of December 16, 2022 at 11:56 a.m. In total, Mr. Cleckley paid $177.60 for the rental.

Det. Phillips elected not to obtain hotel surveillance footage on December 17, 2022. Instead, on December 22, 2022, he returned to the hotel to seek out the footage. Det. Phillips has claimed that he was unable to download the footage at that time. However, he also noted that Mr. Patel permitted him to view certain surveillance footage. Det. Phillips alleges that he observed on the footage Mr. Cleckley and a woman leaving Room 217 at 7:10 a.m. on December 16, 2022. Det. Phillips further alleges that there was no movement in or out of the room until hotel cleaning staff arrived on the morning on December 17, 2022. Det. Phillips took several videos and photos of the surveillance footage using his cell phone.[4] Later in the day on December 22, 2022, two CCSO officers reported to the hotel and affixed a USB device to the surveillance system to download the footage. The next morning, another CCSO officer went back to the hotel to pick up the USB device. On an unspecified date, members of the CCSO attempted to review the footage

---

[2] Based on the later indictment filed in the Circuit Court for Charles County, it appears that the State alleges that the substance was in fact N, N-Demethylpentylone.
[3] No firearms or ammunition were found in the hotel room.
[4] Those photos and videos *do not* show the front desk of the hotel.

using a CCSO computer but were not able to access the contents of the drive. Det. Phillips later learned that the original footage maintained by the hotel had been deleted after one week.

On January 18, 2023, Det. Phillips applied for and received a Charles County Circuit Court warrant to search the contents of the cell phone found on December 17, 2022 in Room 217. In other words, Det. Phillips waited one month to obtain a search warrant for the cell phone. In his affidavit in support of that search warrant, Det. Phillips did not inform Judge Carrington-Martin (1) that law enforcement failed to preserve the original surveillance footage and (2) that hotel records reflected a "Date Out" of December 16, 2022 at 11:56 a.m., nearly 24 hours before the hotel search warrant was issued and well before cleaning staff found the suspected drugs in the room.[5] Mr. Cleckley was not charged in any court with any offenses related to the search of Room 217 of the Red Carpet Inn until August 25, 2023.

### B.    August 25, 2023 – Charles County Indictment Based on Red Carpet Inn Seizure

As noted above, the State of Maryland elected not to charge Mr. Cleckley immediately with offenses related to the December 17, 2022 seizure. Instead, on August 25, 2023, more than *eight months later*, the State obtained an indictment charging Mr. Cleckley in the Circuit Court for Charles County with drug offenses related to that seizure. *See State v. Cleckley*, No. C-08-CR-23-000578.[6] The State applied for an arrest warrant in connection with the indictment. On August 25, 2023, Judge Leo Green, Jr. issued the arrest warrant.

---

[5] Mr. Cleckley is not aware of whether members of law enforcement were able to access the contents of the cell phone. No forensic reports have been provided in discovery.
[6] As reflected in the indictment, Mr. Cleckley was not charged with any firearms offenses or crimes of violence.

### C.    January-February 2024 – Surveillance Investigation

According to CCSO reports, in January 2024, a confidential source (CS) allegedly contacted Det. Phillips and informed the detective that the CS could purchase crack cocaine from a black male named "Mack" who sold crack cocaine in Prince Georges and Charles Counties. The CS provided a phone number for "Mack," whom Det. Phillips had already identified as Mack Cleckley. On February 2, 2024, Det. Phillips and Det. Davis of CCSO met with the CS and showed the CS an arrest photograph of Mr. Cleckley. The CS identified the man in the photograph as "Mack." The detectives asked the CS to arrange a drug transaction with the person identified as Mack Cleckley. The CS called "Mack's" phone number and arranged a meeting at a predetermined location in Prince George's County. Det. Phillips provided the CS with recording equipment and currency. According to CCSO reports, a number of officers participated in conducting surveillance of the controlled buy. Despite knowing that there was an active warrant for Mr. Cleckley's arrest, the officers elected not to execute the warrant on February 2, 2024.

According to information contained in the April 30, 2024 Bragg Motel room search warrant, between February 1 and February 8, 2024, members of the CCSO Narcotics Enforcement Section conducted additional surveillance on Mr. Cleckley in the area of Biddle Road in Accokeek, Maryland. Members of the CCSO allegedly witnessed Mr. Cleckley engage in more than 20 hand-to-hand transactions with unknown individuals. Despite knowing of the existence of an active Charles County warrant for Mr. Cleckley's arrest, CCSO officers made no effort to execute the outstanding arrest warrant.

### D.    April 30, 2024 – The Bragg Motel

At some point after allegedly having observed Mr. Cleckley engage no fewer than 20 suspected drug transactions in February 2024, Det. Phillips decided to execute the August 2023

arrest warrant, which itself related to events dating back to December 2022. On April 30, 2024, members of the CCSO, including Det. Phillips, and members of the United States Marshals Service (USMS) Task Force reported to the Bragg Motel at 7001 Crain Highway in Upper Marlboro, Maryland. CCSO Corporal Thomas Rickard, also a member of the USMS Task Force, served as the lead USMS investigator in connection with the arrest investigation. According to a USMS report, an officer spoke to management at the Bragg Motel, who confirmed that Mr. Cleckley was present in Room 54,[7] and that Mr. Cleckley had rented that room. A hotel registration card shows that Mr. Cleckley's rental was up to date and that he had paid for the room through May 3, 2024.

At 9:09:20 a.m., officers approached the door of Room 54. At 9:09:34, an officer gently knocked on the door. At 9:09:53, another officer knocked louder and screamed: "Cleckley, it's the police. Open the door. We know you're inside." At 9:10:13, the second officer knocked again, and Mr. Cleckley called out from inside of the hotel room. The officer instructed Mr. Cleckley to exit the room with "empty hands first." At 9:10:38, the officer screamed: "Let's go! Open the door!" At 9:10:52, Mr. Cleckley opened the door. He was wearing a white tank-top style undershirt and black underwear. The officers directed Mr. Cleckley to "come out." Mr. Cleckley stepped outside of the door and displayed his empty hands.

---

[7] There is no indication that law enforcement received information that any other person was present in Room 54.



At 9:10:56, one of the officers turned Mr. Cleckley to face the brick wall outside of the building and placed his hands behind his back to handcuff him. Mr. Cleckley was then taken to a truck in the hotel parking lot. The other officer stood inside of the doorway to Room 54. At 9:11:06, another officer directed the officer who was standing in the doorway to enter Room 54. The officers did not have a warrant to search the hotel room.

At 9:11:07, as reflected in a body-worn camera footage clip, no fewer than four officers began searching the hotel room, for which they did not have a search warrant. At 9:11:25, an officer turned his attention to the bed and lifted the mattress from the boxspring, revealing what appears to be a firearm magazine. Other officers proceeded to search other areas of the hotel room. With respect to the arrest and search, the Government has produced just two short body-worn camera clips. The Government has not identified by name the officers wearing the camera that recorded each of the clips. One clip ends at approximately 9:11:53 a.m. It is this clip that shows the beginning of the warrantless searches of the hotel room. The other clip ends at approximately 9:12:05 a.m., but that clip does not show the search of the hotel room.[8]

---

[8] The screenshot below depicts the hotel room at 9:11:50 a.m. after officers determined that it was clear of occupants. Note that the lights of the bathroom, on the right side of the image, are turned off.



Mr. Cleckley was transported away from the scene and taken to the Charles County Detention Center. Officers remained on scene at the hotel and continued the warrantless search of the hotel room.[9] For example, two hours after having first entered the hotel room without a warrant, between 11:12 a.m. and 11:14 a.m., officers took a number of photographs of the inside of the hotel room.[10] From 12:48 p.m. through 12:51 p.m., officers took more photographs inside of the hotel room – without having obtained a warrant to do so. At 1:15 p.m., an officer took another photograph inside of the bathroom of the hotel room. Again, the officers had not obtained a warrant to search the hotel room at the time this photograph was taken.

At 2:10 p.m., five hours *after* officers began searching the hotel room without a warrant, the officers finally obtained a warrant to search Room 54. Ex. A. The warrant was issued by Judge Rolle of the Circuit Court for Prince George's County. DEA Task Force Officer Patrick Marron, also a member of the Prince George's County Police Department, applied for the warrant. After

---

[9] According to the materials provided in discovery, at approximately 10:55 a.m., a drug-detecting dog alerted to Mr. Cleckley's Nissan Maxima, which was lawfully parked in the parking lot of the hotel.

[10] The metadata associated with the native files of the photographs shows the date and time at which the photographs were taken.

receiving the warrant, officers continued their search of the hotel room and recovered alleged drugs, two cell phones, cash, and other items.

### E.    Subsequent Investigation

On May 1, 2024, Mr. Cleckley appeared in the Circuit Court for Charles County and was ordered released on conditions pending trial on the August 2023 indictment.[11] Meanwhile, both state and federal authorities continued investigating the circumstances of the April 30, 2024 arrest and search. On May 1, 2024, TFO Marron applied for and received a Prince George's County Circuit Court warrant to search Mr. Cleckley's vehicle.[12] Ex. B. On May 10, 2024, TFO Marron applied to Judge Turner of the Circuit Court for Prince George's County for a warrant to search the two cell phones found inside of Room 54. Judge Turner rejected the applications for lack of probable cause. On May 15, 2024, TFO Marron again applied for warrants to search those same two cell phones but included additional information about a subject phone number. This time, Judge Johnson of the Circuit Court for Prince George's County approved the warrants. Ex. C.

### F.    The Charges in This Case

Neither federal nor state authorities promptly charged with Mr. Cleckley with offenses related to the events of April 30, 2024. Initially, Mr. Cleckley was charged with violations of his conditions of supervised release in case number LKG-17-592.[13] Mr. Cleckley was ordered detained in connection with the alleged violations.  On November 14, 2024, the Government obtained an Indictment charging Mr. Cleckley with the following offenses based on the events of April 30, 2024: felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1);

---

[11] As the Court will recall, the charges at issue related to items found at a hotel room in December 2022. Mr. Cleckley was not present at the time those items were found.
[12] No narcotics were found in the vehicle.
[13] The 2017 case was originally assigned to Judge Hazel. It was reassigned to this Court in light of Judge Hazel's retirement.

possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[14]

## II.    Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are presumptively unreasonable "except in certain carefully defined classes of cases." *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) (internal quotation marks omitted). "A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions" to the Fourth Amendment's warrant requirement. *Flippo v. West Virginia*, 528 U.S. 11, 13 (per curiam); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (explaining that "the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions") (internal citations omitted). The Government bears the burden of proof in justifying a warrantless search or seizure. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013).

The Fourth Amendment further commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. The Supreme Court has distilled three requirements for a warrant to issue under the Fourth Amendment:

First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to

---

[14] The August 2023 indictment in the Circuit Court for Charles County remains pending.

believe that the evidence sought will *aid in a particular apprehension or conviction for a particular offense.* Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal citations omitted) (emphasis added).

Probable cause for a search exists when, "given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Where an affidavit in support of a search warrant contains illegally obtained information, a reviewing court excises the tainted information and assesses whether "the affidavit's other averments set forth probable cause." *United States v. Gillenwaters*, 890 F.2d 679, 681 (4th Cir. 1989).

### III.    Mr. Cleckley Has Standing to Challenge the Searches and Seizures at Issue

It is well established that "Fourth Amendment rights are personal, which means that a defendant can mount a Fourth Amendment challenge only if he has his own cognizable Fourth Amendment privacy interest in the invaded place." *United States v. Green*, 106 F.4th 368, 375 (4th Cir. 2024). In this case, Mr. Cleckley has a protected Fourth Amendment interest as to each of the searches and seizures at issue. First, there can be no serious argument that Mr. Cleckley lacks a privacy interest as to the seizure and search of his own person. Second, Mr. Cleckley has standing to challenge the searches and seizures of Room 54 of the Bragg Motel. "No less than a tenant of a house, or the occupant of a room in a boarding house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California*, 376 U.S. 483, 490 (1964) (internal citation omitted); *see also United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997) ("A guest in a hotel room has a reasonable expectation of privacy.")." Documents obtained from the Bragg Motel confirm that Mr. Cleckley rented Room 54.



Additionally, those same documents show that as of April 30, 2024, Mr. Cleckley's rental was up to date and paid in full through May 3, 2024.[15]

Third, Mr. Cleckley has standing to challenge the search and seizure of his 2019 Nissan Maxima with Maryland license plate number 2FP7876. The car was registered to Mr. Cleckley, and officers claim to have seen Mr. Cleckley driving it on a number of occasions.[16] At the time of the seizure, the car was lawfully parked outside of the hotel room Mr. Cleckley rented. The car keys were located inside of Room 54, where Mr. Cleckley was the only person present. Fourth, Mr. Cleckley has standing to challenge the seizure and search of the cell phones taken by law enforcement from inside of Room 54. As noted above, Mr. Cleckley has standing to challenge all

---

[15] Moreover, mail belonging to Mr. Cleckley and a wallet containing Mr. Cleckley's driver's license were found inside of the hotel room.

[16] Indeed, a USMS arrest report authored by CCSO Corporal Rickard describes the Nissan as "[t]he vehicle the accused was driving[.]" The application in support of the May 1 warrant to search the Nissan identifies the vehicle as "owned by Mack Lee CLEKLEY." Ex. D.

searches and seizures as to Room 54 on April 30, 2024. Moreover, the warrant applications for the cell phones note that the phones were "recovered from Mack Lee CLECKLEY[.]"

## IV. Law Enforcement Acted with Unreasonable Delay in Executing the August 2023 Arrest Warrant, Thereby Violating Mr. Cleckley's Fourth Amendment Rights

This Court should suppress the fruits of the April 30, 2024 arrest, hotel room search, and all evidence derived therefrom, because law enforcement acted with unreasonable delay in executing the August 2023 Charles County arrest warrant. As a result of the unreasonable delay in executing the arrest warrant, members of law enforcement gained access to a location they would not have otherwise been permitted to search: Room 54 of the Bragg Motel. As noted above, on August 25, 2023, the State of Maryland obtained an indictment charging Mr. Cleckley in the Circuit Court for Charles County with offenses related to the December 2022 seizure of drugs from the Red Carpet Inn. CCSO Det. Phillips was the lead investigator into the December 2022 allegations. The State sought the arrest warrant at the urging of Det. Phillips. As reflected in a USMS Report of Investigation authored by CCSO Cpl. Rickard, "Pursuant to an on-going drug investigation, Det. Phillips #669 obtained a Circuit Court arrest warrant for Mack Lee Cleckley." Ex. D.

Mr. Cleckley is unaware of any actions Det. Phillips or other members of the CCSO took to execute the arrest warrant between August 25, 2023 and February 2, 2024, a period of more than five months. Mr. Cleckley was not difficult to find. He was on federal supervised release and therefore had regular contact with the United States Probation Office. More egregiously, Det. Phillips became personally aware of Mr. Cleckley's whereabouts as of at least February 2, 2024, when he orchestrated a controlled buy operation in which a CCSO informant allegedly purchased cocaine from Mr. Cleckley. Additionally, as stated in the affidavit in support of the application for the warrant to search Room 54, between February 1, 2024 and February 8, 2024, detectives from

the CCSO conducted surveillance of Mr. Cleckley in the area of Biddle Road in Accokeek, Maryland[17] and allegedly observed Mr. Cleckley conduct more than 20 hand to hand drug transactions. At no time during that prolonged surveillance operation did Det. Phillips or other CCSO officers execute the August 2023 arrest warrant. Instead, CCSO Det. Phillips waited until April 2024 to contact CCSO Cpl. Rickard and the USMS task force to seek the arrest of Mr. Cleckley at the hotel where he rented a room. This Court should not countenance law enforcement's unreasonable delay in executing the arrest warrant.

The Fourth Circuit has held that "[p]olice officials are required to use diligence in the execution of arrest warrants. They may not hold one unexecuted for an unreasonable period of time in the hope that they may ultimately find the defendant in a house or other building which they would like to search, but which they could not lawfully search except as an incident of a lawful arrest." *United States v. Weaver*, 384 F.2d 879, 880 (4th Cir. 1967). In *Weaver*, there was a valid warrant for the defendant's arrest issued out of the District of Columbia. Narcotics agents testified that they attempted to execute the arrest warrant after its issuance and conducted surveillance in areas where the defendant was thought to frequent but did not locate him. Sixteen days after the arrest warrant was issued, the agents received a tip that the defendant could be found at Washington National Airport. The agents located the defendant's vehicle and arrested him after he disembarked from a flight. During a search incident to the arrest, the agents found on the defendant's person heroin and cocaine. The defendant moved to suppress the fruits of the arrest and search based on the delay between the issuance of the warrant and its execution. In that case, the Fourth Circuit affirmed the denial of the motion to suppress because (1) the interval between the issuance of the warrant and its execution – 16 days – was short; (2) in the interim, agents had

---

[17] Accokeek is located in Prince George's County in close proximity to the Charles County border.

14

been searching for the defendant; and (3) the arrest was executed in a parking lot and the only search involved a search of the defendant's person, not a building.

In *United States v. Ordonez-Zometa*, 141 F.4th 531, 551 (4th Cir. 2025), the Fourth Circuit recently applied the legal principle at issue in *Weaver*. In that case, the defendant argued for the first time on appeal, that Prince George's County Police Department officers violated his Fourth Amendment rights when they executed a Virginia arrest warrant 24 hours after it had been issued. In that case, one day after the issuance of the arrest warrant, PGPD officers were conducting surveillance of the defendant and observed him leave his house and enter a Nissan, which then traveled onto a public roadway. After observing a traffic violation, PGPD officers conducted a traffic stop and executed the arrest warrant. At the time of the arrest, the officers seized the defendant's cell phone, which they later searched. On appeal, the defendant argued that it was constitutionally impermissible for the officers to wait until he left his home and got into the Nissan to execute the arrest warrant. He further argued that officers delayed in executing the arrest warrant so as to gain access to search the Nissan and detain other individuals. Applying the plain error standard of review, the Fourth Circuit affirmed the denial of the motion to suppress. In doing so, the Fourth Circuit reaffirmed the principle of *Weaver*: "To be sure, police officers should act with diligence in the execution of an arrest warrant." *Ordonez-Zometa*, 141 F.4th 531 at 551. However, the Fourth Circuit found that the officers had acted diligently because less than 24 hours had elapsed between the issuance of the warrant and its execution.

Citing *Weaver*, the Fourth Circuit noted that it has "cautioned against law enforcement intentionally withholding the execution of an arrest warrant in hopes of gaining access to a location they could not otherwise search." *Id*. But the Fourth Circuit declined, on plain error review, to probe the subjective intent of the officers and found instead that there was no basis for concluding

15

that the police delayed the arrest to manufacture a pretext to search the Nissan, which itself was allegedly used in the commission of the homicide that led to the arrest warrant. Under the objective reasonableness standard of the Fourth Amendment, the Fourth Circuit affirmed the district court's ruling.

The circumstances at issue in Mr. Cleckley's case are far different from those in *Weaver* and *Ordonez-Zometa*. Instead of a one-day or sixteen-day delay in the execution of an arrest warrant, this Court is presented with a delay of more than *eight months*. Unlike in *Weaver* and *Ordonez-Zometa*, there is no evidence that members of the CCSO diligently searched for Mr. Cleckley between August 2023 and February 2, 2024, the date on which the first controlled buy occurred. Worse still, even when the same CCSO officer who investigated the conduct giving rise to the arrest warrant began overseeing an operation in which several other CCSO officers observed Mr. Cleckley allegedly engage in 20 hand to hand transactions over the course of a week, the officers made no effort to execute the outstanding arrest warrant. Law enforcement continued to delay and only executed the warrant once they had located Mr. Cleckley inside of a hotel room,[18] which they then searched. The conduct of the CCSO was objectively unreasonable. It is not reasonable to make no effort to locate an individual (who is on supervised release) for several months after the issuance of an arrest warrant. It is not reasonable to observe that same individual engaging in allegedly illegal transactions of 20 occasions over the course of several days and fail to execute the active warrant. CCSO officers had ample opportunity to execute the arrest warrant well before April 30, 2024. They chose not to do so. And on April 30, law enforcement only entered and searched Room 54 in relation to the arrest of Mr. Cleckley. The officers did not have

---

[18] Room 54 is *not* located in the same hotel where the December 2022 seizure was made.

a warrant to search that room. For these reasons, this Court should suppress the fruits of the April 30, 2024 arrest of Mr. Cleckley, search of Room 54, and all evidence derived therefrom.

## V.     The Warrantless Search of Room 54 Violated Mr. Cleckley's Fourth Amendment Rights

After Mr. Cleckley stepped outside of the hotel room and was placed in handcuffs, members of law enforcement entered the room and began conducting a search. They did not have a warrant authorizing them to do so. To the extent the Court concludes that law enforcement's eight-month delay in executing the arrest warrant does not justify suppression, the Court should suppress all evidence derived from the unlawful warrantless search of Mr. Cleckley's hotel room. "Warrantless searches are presumptively unreasonable except in certain carefully defined classes of cases." *United States v. Patiutka*, 804 F.3d 684, 688 (4th Cir. 2015) (internal quotation and citation omitted). "The government bears the burden of proof in justifying a warrantless search or seizure." *United States v. Davis*, 997 F.3d 191, 195 (4th Cir. 2021) (quotation and citation omitted). Accordingly, Mr. Cleckley has no burden to anticipate the Government's attempts to justify the presumptively unreasonable conduct of law enforcement. Nonetheless, it is apparent from materials provided in discovery that the Government intends to argue that after Mr. Cleckley's arrest, law enforcement lawfully entered Room 54 and searched it in order to conduct a protective sweep. This argument, if advanced, fails.[19]

---

[19] The officers did not enter the hotel room before arresting Mr. Cleckley. To the contrary, Mr. Cleckley was arrested when he stepped *outside* of Room 54. He was promptly removed from the scene. Accordingly, the warrantless search of the hotel room cannot be justified as a search incident to a valid arrest as nothing inside of the hotel room was within Mr. Cleckley's immediate control at the time of the arrest. *See, e.g.*, *United States v. McCants*, 664 F. Supp. 2d 620, 623 (D.S.C. 2009) (granting motion to suppress where officers arrested a defendant outside of his residence and then searched the residence without a warrant and noting that "[t]he Government can cite to no precedent, and this Court is aware of none, where any court has held that the arrest of a suspect near the door of a residence automatically allows police to circumvent the warrant requirement

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The legality of a protective sweep is rooted in the interest of officers "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id*. at 333. For a warrantless protective sweep to comport with the requirements of the Fourth Amendment, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 334. "[A] lack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v. Everett*, 91 F.4th 698, 710 (4th Cir. 2024) (internal quotation and citation omitted). "The protective sweep exception requires more than a generalized worry of danger." *Id*.

The circumstances of this case cannot justify a protective sweep. Law enforcement had *no basis* to believe there was another person present inside of Room 54, much less a person who posed a threat to officer safety. Before arresting Mr. Cleckley, law enforcement spoke to management at the hotel. Hotel management informed law enforcement that Mr. Cleckley had rented Room 54 and that he was present inside of it. There is no indication whatsoever that hotel management informed law enforcement that there was another person inside of the hotel room.[20] Law enforcement was not present to execute an arrest warrant for a violent offense. To the contrary, the

---

(and even the information burden necessary to conduct a protective sweep) and gain the ability to 'sneak a peek' inside the residence in question.").

[20] And in fact, there *was no other person* inside of the hotel room.

arrest warrant was issued in connection with an indictment alleging only drug offenses.[21] There is no indication that officers observed Mr. Cleckley with a firearm during their extensive surveillance of him more than two months earlier. Instead, they allegedly observed him engaging in street-level drug sales – information that was in any event stale by the time of the execution of the delayed execution of the arrest warrant.

By contrast, in *Everett*, 91 F.4th at 710, the Fourth Circuit upheld a protective sweep where: (1) the defendant was a participant in a large-scale drug enterprise; (2) when arresting the defendant's co-conspirators, officers found firearms on them or nearby; (3) the day before the arrest, officers recovered a firearm at a stash house location associated with the defendant; and (4) another person was actually present on the premises at the time of the arrest. None of those factors is present here. "If this Court were to validate the Government's protective sweep in this instance, it would essentially be validating any future protective sweeps of suspects' residences where police are simply unsure whether there is someone else in the residence or not, which would be virtually all cases." *United States v. McCants*, 664 F. Supp. 2d 620, 625-26 (D.S.C. 2009). The Fourth Amendment does not permit such a result. This Court should grant the motion to suppress.

## VI.    Assuming the Officers Were Justified in Conducting a Protective Sweep, the Officers Violated Mr. Cleckley's Fourth Amendment Rights by Exceeding the Scope of a Lawful Protective Sweep

"A protective sweep is limited to a cursory inspection of those spaces where a person may be found and should last no longer than it takes to complete the arrest and depart the premises." *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (internal quotations and citation omitted). Officers violate the Fourth Amendment when they exceed the scope of a lawful

---

[21] As far as Mr. Cleckley is aware, no other person has been charged in relation to the December 2022 seizure that gave rise to the August 2023 indictment.

protective sweep. *E.g.*, *United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011) (noting that "[o]pening luggage and cabinets under these circumstances appears to exceed the scope of a protective sweep, and the government at oral argument conceded as much," but affirming denial of motion to suppress because officers *did not* include in a subsequent search warrant application any information obtained from the initial search of luggage and officers would have sought a warrant even had they not conducted the initial search).

    In this case, officers exceeded the scope of a protective sweep by lifting the mattress of the hotel room bed from the boxspring to inspect an area where it would be wholly unreasonable to expect a person to be found. *See, e.g.*, *United States v. Ford*, 56 F.3d 265, 270 (D.C. Cir. 1995) (holding that "the law enforcement officer plainly exceeded the permissible scope of a protective sweep" in lifting a mattress); *see also United States v. Walker*, 143 F.4th 889 (7th Cir. 2025) (concluding that "even assuming the protective sweep was justified, it became unlawful in scope when officers lifted the mattress" and noting that "[a]lthough it may have theoretically been possible for a person to have hollowed the inside of the mattress or box spring to create a hiding place from which to attack, theoretical possibilities cannot be enough. Finding otherwise would permit officers to lift a mattress in every protective sweep, regardless of the reasonableness of their suspicions or configuration of the premises").

    In this case, the officers further exceeded the scope of any protective sweep when they remained inside of the hotel room – which they already determined contained no other occupants – and conducted further searches by, at a minimum, taking photographs inside of the room for hours after the room was deemed clear but hours before obtaining a search warrant. For example, the metadata of the following photograph of the inside of the hotel room indicates that the

photograph was taken at 11:13 a.m. – two hours after the completion of the purported protective sweep and three hours before the hotel room search warrant was issued.



To the extent the Government would attempt to argue that Mr. Cleckley misinterprets the import of the metadata and that the photographs were actually taken either immediately after the officers entered the hotel room or only after the issuance of the search warrant, Mr. Cleckley notes that the following photograph depicts a cell phone with the time 11:14 on its home screen on the counter of the bathroom of Room 54. The metadata of the photograph shows the same time.[22]



---

[22] As the Court will see from the body worn camera footage, at 9:11:50 a.m., after officers had already determined that there were no individuals present in Room 54, the lights of the hotel room bathroom were turned off. Yet in this photograph, taken hours after the room was deemed free of occupants and hours before the search warrant was issued, the lights are turned on.

The metadata of the following photograph indicates that it was taken at 12:48 p.m., well before the search warrant was issued.



The metadata of the following photograph, which depicts the toilet of the hotel room, indicates that it was taken at 1:15 p.m., still before the issuance of the search warrant.



By contrast, the metadata of the following photograph indicates that it was taken at 2:16 p.m., *after* the search warrant was issued.



In other words, even assuming law enforcement was authorized to conduct a limited protective sweep, law enforcement officers repeatedly searched the hotel room after the room was cleared of hypothetical occupants but before a warrant had issued. Given that law enforcement far exceeded the narrow scope of a lawful protective sweep (to the extent one was permissible in this case), the Court should find that law enforcement violated Mr. Cleckley's Fourth Amendment rights and suppress evidence recovered as a result of the warrantless searches.

## VII.    The Court Should Suppress the Fruits of the Search Warrants

After waiting eight months to execute the Charles County arrest warrant and then conducting several unjustified warrantless searches of Room 54, law enforcement applied for and received a number of search warrants in this case. First, on April 30, 2024 at 2:10 p.m., law enforcement obtained a warrant to search Room 54. Ex. A. Second, on May 1, 2024, law enforcement obtained a warrant to search Mr. Cleckley's vehicle. Ex. B. And third, after initially submitting deficient applications on May 10, 2024, law enforcement obtained warrants to search Mr. Cleckley's cell phones on May 15, 2024. Ex. C. The Court should suppress all evidence obtained as a result of the execution of these search warrants.

### A.    Fruit of the Poisonous Tree

The Court should suppress evidence obtained through the execution of the search warrants as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Oscar-Torres*, 507 F.3d 224, 227 (4th Cir. 2007). The inclusion of illegally obtained information in a search warrant application invalidates a warrant when that information is "critical to establishing probable cause for the issuance of the warrant." *United States v. Karo*, 468 U.S. 705, 719 (1984). Each warrant relied upon the unlawful actions of law enforcement in executing the Charles County arrest warrant after unreasonable delay and in searching the hotel room without

23

a warrant and without legal justification. In other words, the basis of the probable cause set forth in each warrant consisted of information gleaned from violations of Mr. Cleckley's Fourth Amendment rights on April 30, 2024. Additionally, without the information gained from these constitutional violations, the affidavits in support of the warrants would not suffice to establish probable cause. Had law enforcement not delayed in executing the arrest warrant, Mr. Cleckley would not have been arrested outside of Room 54 eight months after the warrant was issued. Had law enforcement not searched the hotel room without a warrant, there would be no observations of the contents of the room to include in any warrant application.

**B.    Mr. Cleckley is Entitled to a Hearing Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978)**

To the extent the Court declines to suppress the evidence in this case on the basis of law enforcement's unreasonable delay in executing the arrest warrant and unlawful warrantless searches of Mr. Cleckley's hotel room, Mr. Cleckley requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court "held that in certain narrowly defined circumstances a defendant can attack a facially sufficient affidavit." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)." "To obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that the affiant made (1) a false statement (2) knowingly and intentionally, or with reckless disregard for the truth that was (3) necessary to the finding of probable cause." *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (internal quotation and citation omitted). "Along with affirmative false statements, *Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (internal quotation and citation omitted). To obtain a *Franks* hearing on the basis of a material omission in a search warrant application, Mr. Cleckley must make a substantial preliminary showing that: "(1) law enforcement made an

24

omission; (2) law enforcement made the omission knowingly and intentionally, or with reckless disregard for the truth, and (3) the inclusion of the omitted evidence in the affidavit would have defeated its probable cause." *Id.* (citation omitted).

"If a *Franks* hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant must be voided and evidence or testimony gathered pursuant to it must be excluded. A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule[.]"*Colkley*, 899 F.2d at 300 (internal citations omitted).

Each search warrant affidavit in this case contains an egregious falsehood. The affidavits state: "Once inside the room, members of the U.S. Marshal's [sic] Task Force observed in plain view, a loaded rifle magazine in between the mattress and box spring of a bed." This statement is belied by the body-worn camera footage. Simply put, there was no firearm magazine in plain view. The following body worn camera footage screenshot depicts the bed as officers found it when they first entered Room 54 without a warrant.



The officers did not see the magazine until one of them *lifted* the mattress, at which time an officer audibly reacted to the discovery.





A magazine found between a mattress and box spring that is not visible *until the mattress is lifted* is not in plain view. *E.g.*, *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993) (reversing firearm possession conviction and noting that "[i]n the instant case, the weapon was not in plain view" where the weapon was found in between a mattress and box spring).

The affidavits further state that officers "observed in plain view two digital scales, packaging material, several glassine baggies on the nightstand directly next to the bed." The following photographs depict the nightstands on either side of the bed and were both taken,

according to the metadata, *before* the issuance of the search warrant (and well after the conclusion of any purported protective sweep).





It does not appear that there were any packaging materials or glassine baggies in *plain view* on either nightstand. Photographs taken *after* the issuance of the search warrant clearly show that items had been manipulated. For example, in this photograph, which has metadata indicating that it was taken at 2:20 p.m., there is plastic protruding from inside the drawer of the nightstand, Mr.

Cleckley's wallet is open, and the book that was positioned against the electrical outlet has been removed.



Additionally, the affidavits state that officers observed, in plain view, "a clear plastic bag inside the trash can containing loose amounts of an unknown white powder." The trash can was located in the bathroom. Though it appears from photographs taken during the illegal warrantless searches of the hotel room that there was some trash in the trash can, a lengthy report prepared by TFO Marron, the affiant on the search warrants, contains no specific details regarding any powder in a bag recovered from inside of the trash can. Ex. E. The report describes, with weights and locations of recovery, suspected drugs recovered from the toilet tank (not in plain view), from a bag inside of a shoebox (not in plain view), and from a dresser drawer (not in plain view). But there is no indication that officers recovered any suspected drugs in from the trash can. Notably, there is no indication from the body worn camera footage that officers found any drugs in plain view in the trash can. While there is no body worn camera footage for the officer who first entered the bathroom, the body worn camera footage for one of the other officers does not depict any officer calling out from the bathroom to note the presence of drugs. As noted above, the lights to the bathroom were off when officers first searched the hotel room. The evidence refutes any claim that officers saw drugs in plain view in the trash can.

There are also material omissions and misleading statements with respect to the affidavits. The affidavit does not state that Det. Phillips, the lead investigator into the matter giving rise to the August 2023 arrest warrant, personally oversaw the February 2024 surveillance operation yet chose not to execute the arrest warrant at that time.[23] The affidavits state that officers located Mr. Cleckley "inside of room #54 of the Bragg Motel located at 7001 Crain Hwy, Upper Marlboro, Maryland to serve the open Bench Warrant through the Circuit Court of Charles County, Maryland." The affiant did not inform the reviewing judges that Mr. Cleckley was actually arrested *outside* of the hotel room and that the officers did not enter the hotel room for the purpose of *executing* the arrest warrant. The affiant did not inform the reviewing judges that officers only located the magazine after lifting the mattress.  Nor did the affiant inform the reviewing judges that members of law enforcement remained inside of the hotel room and conducted further searches after Mr. Cleckley had already been arrested and removed from the scene but before the search warrant was issued.

These false statements and omissions were made, at a minimum, with a *mens rea* of recklessness. According to his affidavits, Corporal Marron, in addition to his work as a task force officer with the DEA, has been a member of the Prince George's County Police Department for 18 years. Corporal Marron represented to the reviewing judges that he had previously served as a detective in the PGPD, a position that involves overseeing investigations in which other law enforcement officers participate. He also represented that he had previously testified in Maryland courts. Corporal Marron was present on site at the Bragg Motel. Given the fact that his affidavits contain extensive information about the Charles County investigations, it is clear that Corporal

---

[23] The affidavits also contain no information about any efforts taken to execute the arrest warrant in the more than eight months since it had been issued.

Marron worked in concert with Det. Phillips and Cpl. Rickard of the CCSO, as well as with the USMS task force members who arrested Mr. Cleckley.[24] The false statements and omissions identified above are not minor matters. An officer with nearly two decades of experience would understand the importance of making truthful statements and avoiding the inclusion of misleading information in an affidavit. Worse still, each affidavit contains the same false and misleading representations and omissions, even though as time elapsed, law enforcement had many opportunities to submit truthful and complete information. For example, Corporal Marron took the time to add information about Mr. Cleckley's phone number after the initial cell phone warrants were rejected for lack of probable cause,[25] but he did not correct the other serious deficiencies with his affidavit.

Finally, the false statements and omissions were material. The integrity of the April 30 investigation rose and fell on whether officers lawfully entered Room 54 in the course of the execution of the arrest warrant. The affidavits omitted critical information showing that CCSO personnel with knowledge of the open warrant had more than one occasion on which to execute it but deliberately chose not to do so, resulting in a constitutionally unreasonable delay. The affidavits omitted information that Mr. Cleckley was placed under arrest *outside* of the hotel room. The affidavits created the false and misleading impression that officers were required to enter the hotel room to make the arrest. Furthermore, the affidavits misled the reviewing judges about the observations of the officers who first entered the apartment. The firearm magazine was not in plain view. The statements regarding the items on the nightstands and in the trash can are also not borne

---

[24] All of these officers were also present at the Bragg Motel. Also present was Det. D. Jones, badge number 609, of the CCSO. Along with CCSO Det. Phillips, Det. Jones participated in the February 2024 surveillance of Mr. Cleckley.

[25] Mr. Cleckley requests that the Government produce copies of the cell phone data referenced in the warrant application as well as legal process by which the data was obtained.

out by the objective evidence. Moreover, the affidavits failed to inform the reviewing judges that officers remained inside of the hotel room, which had been determined to be clear of other occupants, for several hours without a warrant as they conducted further investigation. In sum, the affidavits at issue set forth the false narrative that: (1) officers acted reasonably and diligently in pursuing Mr. Cleckley's arrest in connection with the August 2023 warrant; (2) officers were required to enter the hotel room to effectuate the arrest; (3) a firearm magazine and drugs were located in plain view in the hotel room; and (4) that officers simply held the scene after clearing it and waiting for a search warrant. None of that is true. Mr. Cleckley is therefore entitled to a *Franks* hearing with respect to the search warrants.

## CONCLUSION

For the reasons set forth above and those to be presented at a hearing, this Court should suppress the fruits of the April 30, 2024 search and seizure of Mr. Cleckley, Room 54 of the Bragg Motel, and all evidence derived therefrom, including the fruits of the search warrants obtained during the investigation. The Court should also hold a *Franks* hearing with respect to the false statements and material omissions contained in the search warrant applications.

Respectfully submitted,

_____/s/_____
John M. McKenna
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044
jmckenna@brennanmckenna.com

## CERTIFICATE OF SERVICE[26]

I HEREBY CERTIFY that on this 21st day of August, 2025, the foregoing was served on

all parties via ECF.


_____/s/_____
John M. McKenna

---

[26] Under Local Rule 207.1, which incorporates by reference Local Rule 105.3, this Motion is slightly over the page limit. Mr. Cleckley respectfully requests that the Court accept this filing as this Motion addresses several legal issues and a complex factual background. Additionally, Mr. Cleckley has included still shots in this Motion to assist the Court in evaluating the arguments. The still shots consume space that it not otherwise occupied by text.