## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Criminal Case No. 24-cr-00329-LKG |
| MACK LEE CLECKLEY, III, | ) ) | Dated:  May 8, 2026 |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION
## ON THE DEFENDANT'S MOTION TO SUPPRESS

### I.   INTRODUCTION

Pending before the Court is Defendant, Mack Lee Cleckley, III's, motion to suppress and request for *Franks* hearing.  ECF No. 34.  This motion is fully briefed.  ECF Nos. 34, 40 and 45. The Court held a hearing on the motion on April 30, 2026.  ECF No. 55.  For the reasons that follow, and those stated during the April 30, 2026, hearing, the Court: (1) **GRANTS-in-PART** and **DENIES-in-PART** the Defendant's motion to suppress and request for *Franks* hearing (ECF No. 34) and (2) **SUPPRESSES** all evidence obtained from the April 30, 2024, warrantless searches of Room 54 of the Bragg Motel located in Upper Marlboro, Maryland, and all fruits thereof, including: (a) all evidence obtained from the initial warrantless searches of Room 54 conducted by members of the Charles County Sheriff's Office, the United States Marshals Service and the Prince George's County Police Department on April 30, 2024, and (b) all evidence obtained pursuant to the April 30, 2024, search warrant, including the loaded rifle magazine, suspected drugs, two iPhones, cash, packaging materials, glassine baggies, and digital scales recovered from Room 54.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A.   Factual Background

In this criminal matter, the Defendant is charged with: (1) felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), based on the events of April 30, 2024.  ECF No. 1; ECF No. 40 at 10.  The case arises from a state criminal investigation involving the Defendant and the December 2022 seizure of certain narcotics found at the Red Carpet Inn located in Indian Head, Maryland.  ECF No. 34.

The Efforts To Arrest The Defendant

As background, on August 25, 2023, a Maryland state grand jury returned an Indictment charging the Defendant with drug offenses related to the December 2022 seizure of certain narcotics found by law enforcement at the Red Carpet Inn located in Indian Head, Maryland.  ECF No. 34 at 4; ECF No. 40 at 4.  On the date of the Indictment, the Circuit Court for Charles County, Maryland issued an arrest warrant (the "Arrest Warrant") for the Defendant's arrest in connection with this case.  ECF No. 34 at 4; ECF No. 40 at 4.

It is undisputed that approximately eight months elapsed thereafter, before the arrest warrant was executed.  *See, e.g.*, ECF No. 34 at 4 and 16; ECF No. 40 at 2 and 6.  In this regard, the evidence before the Court shows that Charles County Sheriff's Office ("CCSO") Detective Casey Phillips made several unsuccessful attempts to execute the Arrest Warrant, during the period of August 25, 2023, through April 30, 2024.  Hr'g Tr. at 18:7–20, 25:4–16, 46:2–47:1–7 (Det. Phillip's testimony).

During that period, Det. Phillips obtained the Defendant's home address and law enforcement visited this address on multiple occasions as well as spoke to known associates and family members of the Defendant.  Hr'g Tr. at 18:7–14 (Det. Phillip's testimony).  But law enforcement was unable to locate the Defendant.  *Id.*

In January 2024, a confidential source informed Det. Phillips that the Defendant was selling crack cocaine in Prince George's County and Charles County.  Hr'g Tr. at 39:12–19 (Det.

---

[1] The facts recited in this memorandum opinion are derived from the Indictment; the Defendant's motion to suppress; the Government's response in opposition thereto; the unofficial transcript of the April 30, 2026, hearing on Defendant's motion (hereinafter "Hr'g Tr. at _"); and the Government's exhibits (hereinafter "Hr'g Gov't Ex. _").  ECF Nos. 1, 34 and 40.

Phillip's testimony). And so, Det. Phillips orchestrated a controlled buy operation on February 4, 2024, during which the confidential source purchased narcotics from the Defendant in Prince George's County. Hr'g Tr. at 21:23–22:1–12 (Det. Phillip's testimony). But Det. Phillips testified that he was unable to effectuate the Defendant's arrest, due to law enforcement safety concerns. Hr'g Tr. at 25:4–16, 46:2–47:7.

The evidence before the Court also shows that after the February 4, 2024, controlled buy, Det. Phillips requested the assistance of the United States Marshal's Service Capital Area Regional Fugitive Task Force ("USMS CARFTF") to ascertain the Defendant's location in February 2024. Hr'g Tr. at 25:17–26:8 (Det. Phillip's testimony); ECF No. 40 at 6 and 12. Investigators subsequently obtained the Defendant's cellphone records and GPS location data, which allowed law enforcement to determine that the Defendant had checked into Room 54 of the Bragg Motel located in Upper Marlboro, Maryland. ECF No. 40 at 12.

The Arrest And Search Of Room 54

On April 30, 2024, members of the CCSO, the USMS CARFTF, and the Prince George's County Police Department ("PGPD") executed the Arrest Warrant at the Bragg Motel. ECF No. 40 at 6. Senior Inspector Tristan Martin of the USMS CARFTF served as team leader for the arrest operation. Hr'g Tr. at 96:22–23 (Inspector Martin's testimony).

Inspector Martin testified that he conducted a tactical briefing before executing the Arrest Warrant, during which he learned that the Defendant had a history of drug and firearms violations, which heightened the team's awareness and informed their approach to executing the Arrest Warrant. Hr'g Tr. at 97:2–25. Inspector Martin also testified that USMS Task Force Officer ("TFO") Thomas Rickard spoke with the manager of the Bragg Hotel to obtain information about where the Defendant was staying at the motel. Hr'g Tr. at 108:14–109:3. Inspector Martin also testified that he understood that the Defendant was the only person staying in Room 54. Hr'g Tr. at 108:21–23.

The body camera video footage shows that, at approximately 9:09 a.m., on April 30, 2024, members of the USMS CARFTF approached the door of Room 54, knocked, and announced themselves as law enforcement. Hr'g Gov't Ex. 4 at 01:02 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 00:44 (Body Worn Camera recording of Detective Kam). The video evidence also shows that approximately one minute and fifteen seconds elapsed before the Defendant opens the door and surrenders to law enforcement. Hr'g

Gov't Ex. 4 at 1:02–2:18 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 00:44–2:00 (Body Worn Camera recording of Detective Kam). During the April 30, 2026, hearing, Inspector Martin testified that, in his training, knowledge, and experience, a delay of that nature typically means that a person is "hiding themselves, hiding something, someone else . . . or something else. Something." Hr'g Tr. at 103:19–20. Inspector Martin also testified that he "felt it [was] prudent . . . to give [the Defendant] a bit more time to open the door before forcing [their] way in," given the Defendant's "criminal history, and knowing that he may have had a gun on the other side of the door." Hr'g Tr. at 103:25–104:4.

The video evidence shows that the Defendant had his hands raised when he opened the motel room door, and the Defendant was wearing boxers and an undershirt. Hr'g Gov't Ex. 4 at 2:19 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:01 (Body Worn Camera recording of Detective Kam). Law enforcement at the scene immediately pulled the Defendant out of the doorway and took him into custody just outside the threshold to Room 54. Hr'g Gov't Ex. 4 at 2:19–2:21 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:01–2:03 (Body Worn Camera recording of Detective Kam). In this regard, the evidence shows that Defendant was cooperative and non-combative during his arrest. Hr'g Gov't Ex. 4 at 2:19–2:21 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Tr. at 105:18–23 (Inspector Martin's testimony).

The video evidence shows that the lights in Room 54 were off at the time of the Defendant's arrest. Hr'g Gov't Ex. 4 at 2:33 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam). And so, law enforcement did not have a clear view of Room 54 when they arrested the Defendant. Hr'g Gov't Ex. 4 at 2:33 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam). The evidence before the Court also shows that law enforcement neither asked the Defendant if anyone else was in Room 54, nor called out to determine if anyone else was in the motel room. Hr'g Gov't Ex. 4 at 2:21–2:32 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam).

After arresting the Defendant, members of the task force entered Room 54 at approximately 9:11 a.m. Hr'g Gov't Ex. 4 at 2:32 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:13 (Body Worn Camera recording of Detective Kam).

4

Inspector Martin testified that law enforcement officers entered Room 54 to conduct a protective sweep of the room, "to secure it for [their] safety, [and] make sure there was no one hiding anywhere in the room." Hr'g Tr. at 105:4–6. Inspector Martin also testified that the law enforcement officers entered Room 54 at this time to obtain clothing for the Defendant to wear during his transport to the detention center. Hr'g Tr. at 105:15–23. In this regard, Inspector Martin testified that, while dressing an arrestee for transport is "not a requirement," it was appropriate and "routine" under the circumstances of this case. Hr'g Tr. at 105:18–25.

During the protective sweep of Room 54, Inspector Martin approached the bed and partially lifted the mattress off the box spring. Hr'g Gov't Ex. 4 at 2:47–2:50 (Body Worn Camera recording of Inspector Tristan Martin). In doing so, Inspector Martin observed a firearm magazine that had been placed between the mattress and box spring. *Id.*; Hr'g Tr. at 114:2–5 (Inspector Martin's testimony).

Inspector Martin testified that he performs similar searches of beds "every single time" he executes an arrest warrant, to check whether anyone is hiding between the mattress and the box spring. Hr'g Tr. at 106:15–22. In this regard, Inspector Martin testified that law enforcement often finds individuals hiding under beds, and that a person could have been hidden under the box spring of the bed in Room 54. Hr'g Tr. at 106:15–19 (testifying that he has personally found individuals hiding in between the mattress and boxspring, or underneath a bed "[a] lot. Maybe 40, 50 times"), 112:17–113:1–2.

During the protective sweep, the law enforcement officers observed "drug packaging material on the bottom shelf of the nightstand located on the left-side of the bed . . . and on the right-side of the bed were two digital scales and two cigarettes containing suspected marijuana inside of the ash tray" and "a plastic bag containing white powder in the trash can." ECF No. 40 at 8–9. Inspector Martin testified that the protective sweep lasted approximately one to two minutes. Hr'g Tr. at 107:5–8.

After concluding the protective sweep, Inspector Martin testified that he informed TFO Rickard that a firearm magazine had been observed. Hr'g Tr. at 115:12–16. Thereafter, other law enforcement officers entered Room 54 and took several photographs of items located inside the motel room. ECF No. 34 at 8 and 20–22; ECF No. 40 at 15–16. It is undisputed that the law enforcement officers did not have a search warrant to search Room 54. *See* ECF No. 34 at 8 and 20–22; ECF No. 40 at 15–16.

5

At 2:10 p.m., approximately five hours after the law enforcement officers first entered Room 54, DEA Task Force Officer ("TFO") Patrick Marron obtained a search warrant to search Room 54 from the Circuit Court for Prince George's County, Maryland. ECF No. 40-1 at 2. The probable cause for the search warrant was based in-part on the "loaded rifle magazine in between the mattress and box spring of [the] bed", "two digital scales", "packaging material, several glassine baggies on the nightstand", "various denominations of U.S. currency on a dining room table and a clear plastic bag inside the trash can containing loose amounts of an unknown white powder" that was observed during the protective sweep. *Id.* at 7–8. The Prince George's County Circuit Court authorized the search warrant for the Room 54. ECF No. 40 at 9. And so, pursuant to the search warrant, law enforcement seized a semi-automatic firearm, loaded with 17 rounds of ammunition in an extended magazine, approximately $2,500 in United States currency, 288 grams of suspected crack cocaine, 174 grams of suspected cocaine base, 124 grams of suspected fentanyl powder, 65 grams of unknown powder, 272 Suboxone strips, two Apple iPhones, and drug paraphernalia. ECF No. 40 at 9.

Subsequent Search Warrants

On May 1, 2024, TFO Marron obtained a second search warrant from the Prince George's County Circuit Court to search the Defendant's 2019 Nissan Maxima, which had been parked in the Bragg Motel parking lot on April 30, 2024. ECF No. 34 at 9–10; ECF No. 40 at 9. On May 15, 2024, TFO Marron also obtained search warrants to search the contents of two iPhones that were seized during the search of Room 54 from the Circuit Court for Prince George's County. ECF No. 34 at 10.

The Indictment

On November 14, 2024, a federal Grand Jury sitting in the District of Maryland returned a three-count Indictment charging the Defendant with felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1); possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), based on the events of April 30, 2024. ECF No. 1. On August 21, 2025, the Defendant filed a motion to, among other things, suppress all evidence obtained from the April 30, 2024, searches of Room 54, and all fruits thereof. ECF No. 34 at 1–2.

#### B.    Relevant Procedural History

On August 21, 2025, the Defendant filed a motion to suppress and for a *Franks* hearing. ECF No. 34.  On October 14, 2025, the Government filed a response in opposition to the Defendant's motion.  ECF No. 40.

The Defendant filed a reply brief on November 19, 2025.  ECF No. 45.  On April 30, 2026, the Court held a hearing on the Defendant's motion.  ECF No. 55.

The Defendant's motion to suppress having been fully briefed, the Court resolves the pending motion.

### III.    STANDARDS OF DECISION

#### A.    The Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Given this, the Fourth Amendment "protects against general warrants . . . 'by requiring a particular description of the things to be seized.'"  *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480–82 (1976)).  And so, generally, law enforcement must obtain a search warrant, that describes with particularity the things to be seized, before conducting a search.  *Id.* at 519.

Relevant to the pending motion, the United States Supreme Court has held that the protective sweep doctrine is a recognized exception to the Fourth Amendment's warrant requirement.  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  A protective sweep is "aimed at protecting the arresting officers."  *Id.* at 335.  Given this, the protective sweep doctrine is rooted in a law enforcement officer's interest in "taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack."  *Id.* at 333.  And so, a protective sweep is permissible when the facts "warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.* at 334; *see also United States v. Jones*, 667 F.3d 477, 484 (4th Cir. 2012) (recognizing that the linchpin of the protective sweep analysis is not "the threat posed by the arrestee, [but] the safety threat

posed by the house, or more properly by unseen third parties in the house" (citing *Buie*, 494 U.S. at 332)).

In this regard, the Fourth Circuit has recognized that a "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *Jones*, 667 F.3d at 484 (citation omitted). The Fourth Circuit has also cautioned that, "allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep." *Id.* (citation omitted). And so, the question of whether a protective sweep is lawful, turns on the standard of "a reasonably prudent officer" and the decision to conduct a protective sweep must be supported by "specific articulable facts underlying the officers' suspicion that other dangerous individuals could be in the [Defendant's] residence." *Id.* at 484–85.

### B.    The Exclusionary Rule

While the Fourth Amendment does not explicitly preclude the use of evidence obtained in violation of its commands, the Supreme Court has established an exclusionary rule that forbids the use of illegally obtained evidence at trial under certain circumstances. *United States v. Davis*, 657 F. Supp. 2d 630, 664 (D. Md. 2009), *aff'd,* 690 F.3d 226 (4th Cir. 2012). In this regard, a Fourth Amendment violation does not necessarily require that evidence will be inadmissible. *Id.* Rather, "the question of suppression will turn on the culpability of the police action and the degree to which exclusion of the evidence will deter future misconduct." *Id.* (citing *Herring v. United States*, 55 U.S. 135, 137 (2009).

The exclusionary rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring*, 555 U.S. at 140 (citation modified). And so, the Supreme Court has held that:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.

*Id.* at 144.

The so-called good faith exception to the exclusionary rule was first recognized in *United States v. Leon*, 468 U.S. 897 (1984). This Court has held that the good faith exception applies when "the police act in an objectively reasonable reliance upon a warrant that is later invalidated

8

for lack of probable cause." *Davis*, 657 F. Supp. 2d at 664.  The good faith exception also applies when warrantless administrative searches are conducted in good-faith reliance on a statute that is subsequently declared unconstitutional.  *Id*. (citing *Illinois v. Krull*, 480 U.S. 340 (1987)).  Relevant to the pending motion, the good faith exception also applies when law enforcement officers rely in good faith on the error of other police officers.  *Id*.  Given this, evidence obtained during an illegal search should only be suppressed when the "law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  *Krull*, 480 U.S. at 348–49 (citation modified).  The Court must also consider whether the deterrent benefit of excluding such evidence outweighs the costs to the justice system.  *Davis*, 657 F. Supp. 2d at 665.

Another exception to the exclusionary rule is the inevitable discovery doctrine.  Under this doctrine, the Government is not precluded from admitting evidence obtained through an illegal search, if the Government proves, by a preponderance of the evidence, that the "police legally could have uncovered the evidence; and second, that police would have done so."  *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984).  The Fourth Circuit has held that the lawful means by which the evidence would have been discovered must be truly independent of the initial illegality, as "the fact making discovery inevitable must arise from circumstances other than those disclosed by the illegal search itself."  *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (citation modified); *see also United States v. Moore*, 2026 WL 595439, at *4 (4th Cir. Mar. 3, 2026) (holding that a subsequent with-warrant search does not qualify as lawful means where the warrant was itself prompted by or tainted by the initial illegal search); *United States v. Kuhn*, 809 F. Supp. 3d 326, 369–70 (E.D.N.C. 2025) (finding that the inevitable discovery was applicable where law enforcement held valid independent search warrants and possessed a concrete investigative process already underway that would have produced the evidence regardless of the constitutional violation).  And so, the Government may also rely upon the inevitable discovery doctrine to admit evidence at trial that was obtained during an illegal search.  *Alston*, 941 F.3d at 138.

### C.    Execution Of Arrest Warrants

Lastly, the Fourth Circuit has held that officers should act with "diligence in the execution of an arrest warrant." *United States v. Weaver*, 384 F.2d 879, 880 (4th Cir. 1967).  In this regard, the Fourth Circuit has cautioned against "law enforcement intentionally withholding the

9

execution of an arrest warrant in hopes of gaining access to a location they could not otherwise search." *United States v. Ordonez-Zometa*, 141 F.4th 531, 551 (4th Cir. 2025) (citing *Weaver*, 384 F.2d at 880). But, "[a]gents are not required to neglect all other investigatory and enforcement activity in order to execute every arrest warrant," and "a delay in executing an arrest warrant upon one whose residential address is not definitely known is far from unreasonable on its face." *Weaver*, 384 F.2d at 880–81.

## IV.   ANALYSIS

The Defendant has moved to suppress all evidence obtained from the warrantless search of Room 54 on April 30, 2024, and all fruits thereof, and for a *Franks* hearing, upon the grounds that: (1) the law enforcement officers unreasonably delayed the execution of the Arrest Warrant and (2) the warrantless entry and search of Room 54 violated his rights under the Fourth Amendment. *See generally* ECF Nos. 34 and 40. Specifically, the Defendant argues that: (1) law enforcement officers acted with unreasonable delay in executing the Arrest Warrant, by waiting more than eight months to arrest him; (2) the warrantless entry into Room 54 cannot be justified as a protective sweep, because law enforcement had no reasonable articulable basis to believe that another person who posed a danger to officer safety was inside the room; (3) the law enforcement officers exceeded the permissible scope of the protective sweep, by lifting the bed's mattress from the box spring, and by remaining inside Room 54 for several hours after the room was cleared, before a search warrant was obtained; (4) the subsequent search warrants obtained by the Government must be suppressed as fruit of the poisonous tree; and (5) the search warrant affidavits contain false statements and material omissions warranting a *Franks* hearing. ECF No. 34 at 13–31.

The Government counters that the Defendant's arrest and the search of Room 54 were lawful, because: (1) Det. Phillips acted with reasonable diligence in executing the Arrest Warrant; (2) the warrantless entry into Room 54 was a lawful protective sweep, because the law enforcement officers on the scene were aware of specific and articulable facts that support a reasonable belief that the room harbored a dangerous individual; (3) Inspector Martin's lifting of the bed's mattress was consistent with his training and experience and within the permissible scope of a protective sweep; (4) the law enforcement officers were permitted to remain in the room after the sweep to secure and preserve the crime scene, and photographing items in plain view did not constitute a search; (5) the subsequent search warrants were independently

10

supported by probable cause and are not subject to suppression as fruit of the poisonous tree; and (6) a *Franks* hearing is not warranted, because the Defendant has not made the substantial preliminary showing of deliberate falsehood or reckless disregard for the truth, that is  required to overcome the strong presumption of validity afforded to search warrant affidavits.  ECF No. 40 at 10–22.  The Government also argues that, even if the protective sweep was unlawful, the good faith and inevitable discovery doctrine exceptions to the exclusionary rule apply to this case and permit the Government to admit the evidence recovered from Room 54 at trial.  *Id.* at 20–22; *see also* ECF No. 55.  And so, the Government requests that the Court deny the Defendant's motion to suppress.  ECF No. 40 at 22.

For the reasons that follow, the evidence before the Court shows that Det. Phillips did not unreasonably delay the execution of the Arrest Warrant.  But, the evidence before the Court also shows that the law enforcement officers on the scene at the Bragg Motel on April 30, 2024, did not have specific and articulable facts to support a reasonable belief that another person posing a threat to the officers was within Room 54 at the time of the execution of the Arrest Warrant.

In addition, the Government has not shown that the good faith exception to the exclusionary rule, or the inevitable discovery doctrine, apply to the facts of this case.  And so, the Court: (1) GRANTS-in-PART and DENIES-in-PART the Defendant's motion to suppress and request for *Franks* hearing (ECF No. 34); and (2) SUPPRESSES all evidence obtained from the April 30, 2024, searches of Room 54 of the Bragg Motel located in Upper Marlboro, Maryland, and all fruits thereof, including: (a) all evidence obtained from the initial warrantless searches of Room 54 conducted by members of the Charles County Sheriff's Office, the United States Marshals Service, and the Prince George's County Police Department on April 30, 2024, and (b) all evidence obtained pursuant to the April 30, 2024, search warrant, including the loaded rifle magazine, suspected drugs, two iPhones, cash, packaging materials, glassine baggies, and digital scales recovered from Room 54.

### A.    The Government Did Not Unreasonably Delay Executing The Arrest Warrant

As an initial matter, the evidence before the Court shows that the Government did not unreasonably delay executing the warrant for the Defendant's arrest.  The Fourth Circuit has held that law enforcement should act with "diligence in the execution of an arrest warrant."  *United States v. Weaver*, 384 F.2d 879, 880 (4th Cir. 1967).  And so, the Fourth Circuit has cautioned against "law enforcement intentionally withholding the execution of an arrest warrant in hopes of

11

gaining access to a location they could not otherwise search." *United States v. Ordonez-Zometa*, 141 F.4th 531, 551 (4th Cir. 2025) (citing *Weaver*, 384 F.2d at 880). But, "[a]gents are not required to neglect all other investigatory and enforcement activity in order to execute every arrest warrant," and "a delay in executing an arrest warrant upon one whose residential address is not definitely known is far from unreasonable on its face." *Weaver*, 384 F.2d at 880–81.

In this case, it is undisputed that approximately eight months elapsed before Det. Phillips executed the Arrest Warrant. In this regard, the evidence shows that the Circuit Court for Charles County issued the Arrest Warrant on August 25, 2023. ECF No. 34 at 4; ECF No. 40 at 4. Thereafter, Det. Phillips did not execute the Arrest Warrant between August 25, 2023, and April 30, 2024. Hr'g Tr. 18:7–20, Hr'g Tr. at 25:4–16, 46:2–47:7 (Det. Phillip's testimony).

While the execution of the Arrest Warrant was unquestionably delayed for several months, the evidence also shows that Det. Phillips took several steps to try to locate the Defendant during this time period. For example, the evidence shows that Det. Phillips obtained the Defendant's home address and that law enforcement visited this address on multiple occasions and spoke to known associates and family members of the Defendant. Hr'g Tr. 18:7–14 (Det. Phillip's testimony). The evidence also shows that, after a confidential source informed Det. Phillips that the Defendant was selling crack cocaine in Prince George's County and Charles County, Det. Phillips orchestrated a controlled buy operation on February 2, 2024, during which the confidential source purchased narcotics from the Defendant in Prince George's County. Hr'g Tr. at 21:23–22:8, 39:12–15 (Det. Phillip's testimony). But Det. Phillips testified that he was unable to effectuate the Defendant's arrest, due to officer safety concerns. Hr'g Tr. at 25:4–16, 46:2–47:7. Det. Phillips then requested the assistance USMS CARFTF to ascertain the Defendant's location in February 2024. Hr'g Tr. at 25:17–26:8 (Det. Phillip's testimony); ECF No. 40 at 6 and 12. There was a several month delay in the USMS CARTF starting work on this case due to other pressing matters. *See, e.g.*, ECF No. 55 (TFO Rickard's testimony). But once, USMS CARFTF located the Defendant, law enforcement officers executed the Arrest Warrant within a few days. Hr'g Tr. at 25:17–26:8 (Det. Phillip's testimony); ECF No. 40 at 6 and 12.

The Court observes that the eight-month delay in executing the Arrest Warrant is substantially longer than the delays that courts have previously upheld under the Fourth Amendment. Notably in *Weaver*, the Fourth Circuit upheld a 16-day delay in executing an arrest warrant, because the Government persuasively put forth evidence to show that the Government

was looking for the Defendant in the interim.  384 F.2d at 880–81.  Similarly, in *Ordonez-Zometa*, the Fourth Circuit held that a 24-hour delay was not unreasonable, because the court does not inquire into law enforcement's strategic motivations for when and how they choose to execute a warrant. 141 F.4th at 551–52.

While the significant delay in this case is concerning to the Court, the evidence before the Court shows that this delay was not due to a lack of diligence, or an attempt to intentionally withhold the execution of the Arrest Warrant in hopes of gaining access to a location that law enforcement could not otherwise search.  Given this, the facts of this case do not support a finding that law enforcement unreasonably delayed executing the Arrest Warrant in contravention of the Fourth Amendment.  *Id.* at 551.  And so, the Court DENIES the Defendant's motion to suppress physical evidence upon the grounds that law enforcement unreasonably delayed the execution of the Arrest Warrant.

### B.    The Search Of Room 54 Was Unlawful

The Defendant's motion to suppress the evidence obtained during the search of Room 54, upon the grounds that the search was unlawful, is more persuasive.  Generally, law enforcement must obtain a search warrant, that describes with particularity the things to be seized, before conducting a search.  *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010).  But the Supreme Court has held that the protective sweep doctrine is a recognized exception to the Fourth Amendment's warrant requirement.  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

A protective sweep is permissible when the facts "warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.* at 334; *see also United States v. Jones*, 667 F.3d 477, 484 (4th Cir. 2012) (recognizing that the linchpin of the protective sweep analysis is not "the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house" (citing *Buie*, 494 U.S. at 332)).  But a "lack of information cannot provide an articulable basis upon which to justify a protective sweep."  *Jones*, 667 F.3d at 484 (citation omitted).  And so, the question of whether a protective sweep is lawful, turns on the standard of "a reasonably prudent officer" and the decision to conduct a protective sweep must be supported by "specific articulable facts underlying the officers' suspicion that other dangerous individuals could be in the [Defendant's] residence."  *Id.* at 484–85.

Here, the Government argues that the initial warrantless search of Room 54, following the Defendant's arrest, did not violate the Fourth Amendment, because the law enforcement officers were conducting a protective sweep. *See* ECF No. 40 at 12–16. But the Court agrees with the Defendant that this search was unlawful, because the facts of this case show that the law enforcement officers lacked a reasonable belief that Room 54 harbored an individual posing a danger to law enforcement for several reasons.

First, the evidence before the Court shows that the law enforcement officers on the scene were not aware of any facts to indicate that someone other than the Defendant was in Room 54. Notably, the evidence shows that TFO Rickard confirmed with the manager of the Bragg Motel that the Defendant was the only occupant of Room 54. Hr'g Tr. at 108:21–23 (Inspector Martin's testimony).

The evidence also shows that the law enforcement officers on the scene learned about the Defendant's prior criminal history during the pre-raid debriefing. Hr'g Tr. at 97:2–25 (Inspector Martin's testimony). But there is no evidence before the Court to show that such knowledge of the Defendant's criminal history would have given the law enforcement officers reason to believe that another person that posed a danger would be inside Room 54.

The evidence before the Court showing that the Defendant briefly delayed opening the door to Room 54 also fails to show that there was reason to believe that another person that posed a danger was inside Room 54. In this regard, the evidence shows that there was a delay of one minute and fifteen seconds before the Defendant opened the motel room door and surrendered to law enforcement. Gov't Ex. 4 at 01:02–2:18 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 00:44–2:00 (Body Worn Camera recording of Detective Kam). Inspector Martin testified that this delay could mean either that, the Defendant was "hiding [himself,] hiding something, someone else . . . or something else." Hr'g Tr. at 103:19–20. And so, this delay, alone, is also not sufficient to show that law enforcement reasonably believed that someone other than the Defendant was inside Room 54. *Jones*, 667 F.3d at 484 (stating that a "lack of information cannot provide an articulable basis upon which to justify a protective sweep").

Second, the video evidence makes clear that the Defendant posed no danger or threat to law enforcement at the time of his arrest. In this regard, the body camera footage shows that the Defendant had his hands raised when he opened the motel room door and that the Defendant was

14

cooperative, non-combatant and surrendered to law enforcement without any opposition. Hr'g Gov't Ex. 4 at 2:19–2:21 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Tr. at 105:18–23 (Inspector Martin's testimony). And so, the evidence shows that the Defendant did not pose a danger to law enforcement prior to the protective sweep. *Jones*, 667 F.3d at 484.

Third, the contemporaneous video evidence also does not corroborate the Government's argument that the law enforcement officers on the scene believed that another person was in Room 54. In this regard, the video evidence shows that the lights in Room 54 were off at the time of the Defendant's arrest. Hr'g Gov't Ex. 4 at 2:33 (Body Worn Camera recording of Inspector Tristan Martin); Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam). Given this, the Court agrees with the Government that it may have been difficult for the law enforcement officers to clearly see the interior of the motel room. *See, e.g.*, ECF No. 55; *see also* Hr'g Gov't Ex. 4 at 2:33 (Body Worn Camera recording of Inspector Tristan Martin); Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam).

But the evidence before the Court also makes clear that the law enforcement officers neither asked the Defendant if anyone else was in Room 54, nor called out to determine if anyone else was in the motel room before commencing the protective sweep. Hr'g Gov't Ex. 4 at 2:21–2:32 (Body Worn Camera recording of Inspector Tristan Martin); Hr'g Gov't Ex. 5 at 2:04 (Body Worn Camera recording of Detective Kam). And so, again, the evidence before the Court does not support a finding that the law enforcement officers reasonably believed that Room 54 harbored an individual posing a danger to those on the arrest scene.

Lastly, the Court also observes that the Government advances somewhat conflicting theories to explain why the law enforcement officers entered Room 54 immediately after the Defendant's arrest. On the one hand, the Government argues that law enforcement entered the room to perform a protective sweep. *See, e.g.*, ECF No. 55; ECF No. 40 at 12–16. But the Government also argues that the law enforcement officers entered the room to obtain clothing for the Defendant, even though Inspector Martin testified that obtaining such clothing was not required before transporting the Defendant. Hr'g Tr. at 105:15–25.

Given this, the Government simply has not met its burden to show that the law enforcement officers engaged in a lawful protective sweep of Room 54.

And so, the Court concludes that the warrantless search of Room 54 was unlawful under the Fourth Amendment.

15

The Court also observes that, even if the law enforcement officers had performed a lawful protective sweep in this case, the evidence shows that Inspector Martin's search between the mattress and box spring of the motel room bed exceeded the permissible scope of that sweep. In this regard, the video evidence shows that Inspector Martin lifted the mattress of the motel room bed and searched the area between the mattress and the box spring. Hr'g Gov't Ex. 4 at 2:47–2:50 (Body Worn Camera recording of Inspector Tristan Martin). Inspector Martin testified that he did so to determine if a person was hiding in that area. Hr'g Tr. at 106:15–22. But the video evidence makes clear that it would not be possible for a person to hide between the mattress and box spring of the bed in Room 54. Gov't Ex. 4 at 2:49 (Body Worn Camera recording of Inspector Tristan Martin); *see also United States v. Walker*, 143 F.4th 889, 898 (7th Cir. 2025) (holding in an analogous case that a protective sweep becomes unlawful in scope when officers lift a mattress and the government fails to identify anything in the record to indicate "that the officers had here reason to believe the area between the mattress and box spring had been hollowed out such that lifting the mattress would be necessary to dispel the reasonable suspicion of danger" (citation modified)). And so, the Court also grants the Defendant's motion to suppress the firearm magazine recovered in Room 54 for this independent reason.

### C.    Suppression Of The Evidence Is Warranted

Having determined that the initial search of Room 54 was not a lawful protective sweep, the Court next considers whether to apply the exclusionary rule in this case and whether there is an exception to that rule that would permit the Government to admit the evidence recovered during the search of Room 54 at trial. The Supreme Court has established an exclusionary rule that forbids the use of illegally obtained evidence at trial under certain circumstances. *United States v. Davis*, 657 F. Supp. 2d 630, 664 (D. Md. 2009), *aff'd,* 690 F.3d 226 (4th Cir. 2012). While a Fourth Amendment violation does not necessarily require that evidence will be inadmissible, "the question of suppression will turn on the culpability of the police action and the degree to which exclusion of the evidence will deter future misconduct." *Id.* (citing *Herring v. United States*, 555 U.S. 135, 137 (2009).

Relevant here, the so-called good faith exception to the exclusionary rule applies when, among other things, law enforcement officers rely in good faith on the error of other police officers. *Id.*; *see Herring*, 55 U.S. at 144. Given this, the evidence obtained during an illegal

16

search should only be suppressed when the "law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Illinois v. Krull*, 480 U.S. 348–49 (1987). Another exception to the exclusionary rule is the inevitable discovery doctrine, which allows the Government to admit evidence obtained through an illegal search, if the Government proves, by a preponderance of the evidence, that the "police legally could have uncovered the evidence; and second, that police would have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019). And so, the Government may also admit evidence at trial that was obtained during an illegal search, if it can show that the police would have legally uncovered the evidence. *Id.*

The Government argues that the Court should not exclude the evidence seized from Room 54, because the good faith exception to the exclusionary rule and the inevitable discovery doctrine apply to this case. ECF No. 40 at 20–22; ECF No. 55. The Court disagrees for two reasons.

First, the Court is not satisfied that the good faith exception to the exclusionary rule applies to the specific facts of this case. As discussed above, the facts before the Court make clear that the law enforcement officers on the scene at the time of the execution of the Arrest Warrant were aware that they did not have a search warrant to search Room 54. *See generally supra* Section IV.B. The evidence also shows that these law enforcement officers did not have reason to believe that another person that posed a danger to the officers was within Room 54 at the time of the Defendant's arrest. *Id.* In fact, the evidence before the Court indicates that the information that the law enforcement officers did have indicated that the Defendant was the sole occupant of Room 54. *Id.*

The evidence also shows that the law enforcement officer's decision to search under the mattress of the motel room bed exceeded the permissible scope of a protective sweep and was consistent with a search based on the evidence. In addition, the evidence shows that law enforcement officers re-entered the room on multiple occasions, after the purported protective sweep, to search the room, and photograph items in the room over a 5-hour period, before obtaining a search warrant. ECF No. 34 at 20–22; ECF No. 40-1 at 2.

While the Government maintains that the law enforcement officers needed to repeatedly enter Room 54 to secure the room, it has not sufficiently explained why the officers could not have secured the motel room by other means. And so, the Court concludes that the totality of the

17

evidence in this case shows that the law enforcement officer's decision to enter Room 54 to conduct a purported protective sweep was sufficiently deliberate and culpable to warrant suppression of the evidence seized as a result of this unlawful search. *Krull*, 480 U.S. at 348–49.

The Government also has not shown, by a preponderance of the evidence, that the evidence found in Room 54 would have been inevitably discovered through lawful means. *Alston*, 941 F.3d at 138. The evidence before the Court shows that the law enforcement officers relied upon the evidence seen in plain view by the officers who performed the purported protective sweep to obtain a search warrant to search Room 54. ECF No. 40-1 at 7–8. Given this, this evidence would not have been discovered independently of the initial illegal search of Room 54. *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (holding that "the fact making discovery inevitable must arise from circumstances other than those disclosed by the illegal search itself"); *see also United States v. Moore*, No. 24-4195, 2026 WL 595439, at *4 (4th Cir. Mar. 3, 2026) (A subsequent search warrant does not qualify as lawful means where the warrant was itself prompted by or tainted by the initial illegal search.). And so, the inevitable discovery doctrine also does not apply to the facts of this case.

For the each of the above reasons, the Court GRANTS the Defendant's motion to suppress, based upon the unlawful warrantless search of Room 54. In doing so, the Court is mindful of the need to carefully consider whether the deterrent benefit of excluding the evidence recovered from Room 54 outweighs the costs to the justice system and that suppressing this evidence may result in the Defendant not being prosecuted for the offenses charged in this case. *Davis*, 657 F. Supp. 2d at 665. But the conduct of law enforcement in this case is sufficiently concerning to the Court that a deterrent is needed, to ensure that such conduct does not occur again and jeopardize future criminal prosecutions. And so, the Court SUPPRESSES all evidence obtained from the April 30, 2024, searches of Room 54 of the Bragg Motel located in Upper Marlboro, Maryland, and all fruits thereof.[2]

## V.   CONCLUSION

For the foregoing reasons, the Court:

> (1) **GRANTS-in-PART** and **DENIES-in-PART** the Defendant's motion to suppress and request for *Franks* hearing (ECF No. 34); and

---

[2] Because the Court has determined that the search of Room 54 was unlawful under the Fourth Amendment, the Court does not address the Defendant's motion for a *Franks* hearing.

18

(2) **SUPPRESSES** all evidence obtained from the April 30, 2024, searches of Room 54 of the Bragg Motel located in Upper Marlboro, Maryland, and all fruits thereof, including: (a) all evidence obtained from the initial warrantless searches of Room 54 conducted by members of the Charles County Sheriff's Office, the United States Marshals Service, and the Prince George's County Police Department on April 30, 2024, and (b) all evidence obtained pursuant to the April 30, 2024, search warrant, including the loaded rifle magazine, suspected drugs, two iPhones, cash, packaging materials, glassine baggies, and digital scales recovered from Room 54.

The Court issued an Order consistent with this memorandum opinion on May 1, 2026.
**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

19