**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  LKG-24-329** |
| | : | |
| **MACK LEE CLECKLEY, III** | : | |
| | : | |
| **Defendant.** | : | |

---

## RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR RECONSIDERATION

Defendant Mack Lee Cleckley, III ("Mr. Cleckley"), by and through his counsel, John M. McKenna, and Brennan, McKenna & Lawlor, Chtd., respectfully submits the following response in opposition to the Government's Motion for Reconsideration (ECF No. 64). Mr. Cleckley incorporates the arguments presented in his Motion to Suppress (ECF No. 34), Reply in Support of his Motion to Suppress (ECF No. 45), and the arguments he presented at the April 30, 2026 motions hearing before this Court. For the reasons set forth below, the Government falls far short of its burden to show that the Court clearly erred in granting Mr. Cleckley's Motion to Suppress. The Court should deny the Government's Motion for Reconsideration.

### I.    Background

Shortly after 9 a.m. on April 30, 2024, members of the Charles County Sheriff's Office and a United States Marshals Service task force arrived at the Bragg Motel in Upper Marlboro, Maryland to execute an August 2023 Charles County Circuit Court warrant for the arrest of Mack Cleckley, a warrant that was premised on alleged conduct dating back to December 2022. At approximately 9:10 a.m., Mr. Cleckley was peacefully taken into custody outside of Room 54, a room rented by Mr. Cleckley and for which Mr. Cleckley had paid through May 3, 2024. Certain

1

members of the task force entered Room 54 without a warrant and searched the room, including underneath of the mattress. Other law enforcement personnel subsequently entered and continued to search, still without a warrant. Well over one hour later, at least one Prince George's County Police officer, Officer Wu, arrived on scene and continued to search the room (and photograph it) without a warrant. Officer Wu entered and exited the room, without a warrant, on several occasions. Several hours later, at 2:10 p.m., Patrick Marron, a PGPD detective and DEA task force officer, obtained a warrant to search Room 54. The affidavit in support of the warrant relied on alleged observations of officers who searched the room without a warrant. Mr. Cleckley was not immediately charged with offenses arising out of the repeated warrantless searches of Room 54. The Government waited several months, until November 14, 2024, to obtain a federal indictment charging Mr. Cleckley with offenses arising out of the April 30, 2024 searches and seizures. On December 4, 2024, Mr. Cleckley made his initial appearance in this case.

By at least August 8, 2025, the Government was aware that Mr. Cleckley intended to file pretrial motions. (ECF No. 29 at 2.) On August 21, 2025 (nearly 16 months after the events at the Bragg Motel), Mr. Cleckley filed a Motion to Suppress and Request for *Franks* Hearing. (ECF No. 34.) The Motion was supported by five (5) exhibits. The Motion spanned 31 pages of substance.[1] The Motion contained a detailed factual background, replete with references to information in the discovery provided at the time by the Government. The Motion further contained images taken from documents, video footage, and photographs provided in discovery. The Motion cited cases setting forth the applicable legal standards for the issues presented. Notably, the Motion cited authority standing for the uncontroversial legal principle that the Government bears the burden of justifying warrantless searches and seizures. (*E.g.*, ECF No. 34 at 17.) At no point after the filing

---

[1] The 32nd page consisted of a certificate of service.

of the Motion to Suppress did the Government contact counsel for Mr. Cleckley to express any confusion as to the issues raised.

On September 28, 2025 (having had more than one month to review Mr. Cleckley's detailed Motion to Suppress), the Government requested an extension of the deadline by which to file its response to Mr. Cleckley's Motion to Suppress. (ECF No. 38.) Mr. Cleckley consented to that request. (ECF No. 38 ¶ 8.) In support of the requested extension, the Government noted that Government counsel attended a training program from September 8, 2025 through September 18, 2025 and that before the training, Government counsel attempted to meet with multiple law enforcement witnesses in order to draft the Government's opposition. The Government further represented that it met with "the necessary law enforcement witnesses on September 26, 2025." (*Id*. ¶ 7.) On October 14, 2025 (now 17.5 months after the events at the Bragg Motel and after having conferred with multiple witnesses to prepare a response brief), the Government filed a 23-page response to Mr. Cleckley's Motion to Suppress.[2] (ECF No. 40.) The next morning, undersigned counsel wrote to the Government to request the production of a body-worn camera video that had not previously been provided in discovery, but which was depicted in a still shot contained in the Government's response brief (ECF No. 40 at 7). The Government subsequently produced the video file.[3] In its response brief, the Government set forth the legal and factual grounds on which it intended to rely to justify the presumptively unconstitutional warrantless searches and seizures related to Room 54.

---

[2] The substance of the Response spans approximately 21.25 pages.
[3] Later, on October 23, 2025, counsel requested that the Government produce the "cellphone records and GPS location data" referenced at ECF No. 40 at 12 (but which was not previously provided in discovery). The Government produced certain records responsive to the request.

In its brief, Government made **no argument concerning or mention of**: (1) the clothing Mr. Cleckley was wearing at the time of his arrest; (2) the exigent circumstances doctrine; (3) the inevitable discovery doctrine; or (4) the independent source doctrine.

On November 19, 2025, Mr. Cleckley filed a reply brief in support of his Motion to Suppress.[4] (ECF No. 45.) Again, Mr. Cleckley's reply brief contained detailed references to the materials provided in discovery, including documents, photographs, and video footage – all in response to the Government's arguments in its response brief. At no point after the filing of the reply brief did the Government seek leave to file a sur-reply. By January 23, 2026, the Court scheduled a hearing on Mr. Cleckley's Motion to Suppress for April 30, 2026. The Government submitted no supplemental authority or argument in advance of the hearing.[5]

Before the hearing, the Government notified Mr. Cleckley that it intended to call the following witnesses: (1) Senior Inspector Tristan Martin of the USMS; (2) DEA Task Force Officer Patrick Marron (also of the PGPD); (3) Charles County Sheriff's Office Det. Casey Phillips; (4) DEA Task Force Officer Ricky Wu (also of PGPD); and (5) Corporal Thomas Rickard of the Charles County Sheriff's Office (also of a USMS task force). At the outset of the hearing, the Court informed the parties that it had carefully reviewed the filings. The Government ultimately called all five witnesses at the motions hearing. The parties introduced exhibits. At points throughout the hearing, the Court indicated for the parties factual and legal questions that were of particular concern to it. As to certain witnesses, the Court posed its own questions. The

---

[4] The filing, which spanned 14 pages, contained approximately 13 pages of substance; the last page contained only the certificate of service.

[5] The Government did, however, make several discovery productions on the eve of the hearing, including of materials like certain photographs by taken members of law enforcement on April 30, 2024 that should have been produced well before Mr. Cleckley even filed his Motion to Suppress as they had been in the possession of the Government's investigating officers.

Court afforded the parties ample time for oral argument at the end of the lengthy evidentiary hearing. The Court then issued an indicative oral ruling. On May 1, 2026, the Court issued an Order (ECF No. 59) granting in part and denying in part Mr. Cleckley's Motion to Suppress. Notably, the Court ordered the suppression of "all evidence obtained from the initial warrantless searches of Room 54" and "all evidence obtained pursuant to the April 30, 2024, search warrant" for Room 54. (*Id*.) On May 8, 2026, the Court issued a comprehensive Memorandum Opinion further explaining the reasons for the Court's decision.[6] (ECF No. 61.)

On May 15, 2026, the Government filed the pending Motion for Reconsideration. (ECF No. 64.)

## II.   Legal Standard – Motion for Reconsideration

"The Federal Rules of Criminal Procedure do not address whether a party may move for reconsideration of a decided motion." *United States v. Carroll*, No. 7:12-CR-57-F, 2012 U.S. Dist. LEXIS 155440, at *2 (E.D.N.C. Oct. 29, 2012). "Federal courts that have addressed the issue have borrowed the standard from Rule 59 of the Federal Rules of Civil Procedure." *Id*. (collecting cases). "Motions for reconsideration may be granted on one of three grounds: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence, or (3) to correct a clear error of law or to prevent manifest injustice." *United States v. Russell*, 747 F. Supp. 3d 827, 829 (D. Md. 2024) (citing *Wojcicki v. SCANA/SCE&G*, 947 F.3d 240, 246 (4th Cir. 2020)). Motions for reconsideration "may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal

---

[6] The Court denied in part Mr. Cleckley's Motion to Suppress with respect to the argument that law enforcement's significant delay in executing the August 2023 arrest warrant violated Mr. Cleckley's constitutional rights. (ECF No. 61 at 13.) In light of the ruling that "the search of Room 54 was unlawful under the Fourth Amendment," the Court did not address Mr. Cleckley's motion for a *Franks* hearing. (*Id*. at 18 n.2.)

theory that the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Indeed, "a motion for reconsideration is not an opportunity for litigants to reargue their previous positions or present new or alternative theories that they failed to set forth in connection with the underlying motion." *Corpac v. Does*, 10 F. Supp. 3d 349, 351 (E.D.N.Y. 2013).

## III.    Exigent Circumstances

The Government's lead argument in its Motion for Reconsideration is the allegation that the Court committed clear error by failing to apply the exigent circumstances doctrine as articulated by the Fourth Circuit in *United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000). In the Government's telling, *Gwinn* authorized the initial warrantless entry into and search of Room 54 to address the purported exigent circumstances created by Mr. Cleckley's state of dress. The Government's argument is procedurally infirm and misleading. The Court should reject it.

As an initial matter, nowhere in its response brief did the Government cite *Gwinn*. Nor did the Government cite *Gwinn* at the motions hearing. Additionally, not once in its response brief did the Government raise the concept of exigent circumstances. In fact, the Government made no mention at all of Mr. Cleckley's state of dress in its written response to the Motion to Suppress. At the motions hearing, the Government never invoked the exigent circumstances doctrine.[7] The Government has cited no case standing for the proposition that a Court commits clear error by failing to address a case or legal doctrine that no party argued. Exigent circumstances are not the kind of circumstances that only become apparent after a party has received an adverse ruling. *Gwinn* was decided over 25 years ago. The Government – the party with the burden of proof – has

---

[7] By contrast, the Government made the tactical and procedurally improper decision to surprise Mr. Cleckley and this Court with an invocation of the inevitable discovery doctrine, a doctrine it elected not to brief. Tr. at 194.

made no effort to explain its failure to argue that doctrine in its brief in response to the Motion to Suppress or at the hearing. There is no reason to excuse the Government's failure to brief and argue *Gwinn* in the first instance. The Court should therefore reject this claim of supposed clear error as a procedural matter and, to the extent the Court addresses the merits of it, the Court should do so only as an alternative analysis.

On the merits, if considered, the Government's exigent circumstances argument fails. In its response to the Motion to Suppress, the Government attempted to justify the initial warrantless entry into Room 54 as an alleged protective sweep to discover potentially hidden persons who posed some risk to the officers.[8] Notably, in its response, the Government made no attempt to satisfy its constitutional burden by citing to exigent circumstances posed by Mr. Cleckley's state of dress. At the motions hearing, the Government's argument about Mr. Cleckley's state of dress contained no reference to any exigencies. In fact, the argument was an afterthought. In oral argument, the Government led with the same (now rejected) argument it presented in writing: namely, that a protective sweep was justified because officers had a reasonable belief that an individual posing a danger was present in the room. After being challenged by the Court, the Government moved on to "the *second point* as to why the officers entered into the room," i.e. to purportedly retrieve clothing. (Tr. at 176., emphasis added) The Court conclusively rejected the Government's justification for the initial entry and search: "But the Court agrees with the Defendant that this search was unlawful, because the facts of this case show that the law

---

[8] *See, e.g.* ECF No. 40 at 7 ("Members of the task force entered the room after the Defendant was detained to conduct a protective sweep of the motel room to ensure no one there posed a danger – in part due specifically to the Defendant's delay in coming to the door."); *Id*. at 13 ("Here, the USMS CARTF team had specific and articulable facts to believe that an individual inside the motel room posed a danger to them" – an argument that has now been rejected by the Court).

enforcement officers lacked a reasonable belief that Room 54 harbored an individual posing a danger to law enforcement for several reasons." (ECF No. 61 at 14.)

Now, the Government changes course. The Government argues that *exigent clothing circumstances* justified the initial entry into and search of the hotel room. In so arguing, the Government presents a misleading and incomplete gloss on the holding of *Gwinn* and the jurisprudence surrounding protective sweeps.

In its Motion for Reconsideration, the Government had relatively little to say about the facts of *Gwinn* and the circumstances the Fourth Circuit considered in its legal analysis. As explained below, *Gwinn* has no bearing on Mr. Cleckley's case. In *Gwinn*, in the early evening hours of May 10, 1998, a West Virginia 911 dispatcher received a call from a woman who advised that her daughter and her daughter's baby were in danger because a man with whom the daughter was living, Dennis Gwinn, had a gun and had threatened to kill the daughter. West Virginia law enforcement responded to the call at a trailer in a remote area. A trooper parked his cruiser within 25 yards of a small trailer with a front porch. The trooper pulled out his weapon and yelled for Dennis Gwinn to come outside. Gwinn complied, wearing only a pair of jeans. The trooper conducted a pat-down of Gwinn and placed him in the back seat of the cruiser. The trooper then asked where the woman was. Gwinn responded that the woman (whom he identified as his girlfriend) was inside of the trailer. The trooper then entered the trailer and found a woman crying and holding a baby. Another trooper entered the trailer and conducted a protective sweep while the first trooper questioned the woman. The woman related that she had been threatened with blue pistol but did not know where Gwinn placed the handgun. The officers searched for the handgun and did not find it. Instead, they found a loaded shotgun under the couch.

8

The officers then left the trailer and put the shotgun in the trunk of a cruiser. The officers prepared to transport Gwinn to a regional jail. A trooper went back to the trailer and asked the woman where Gwinn's shoes were. The trooper also indicated that he needed to get a shirt for Gwinn. The woman directed the trooper to Gwinn's boots in the living room, and she went to another room to retrieve a shirt. The trooper picked up Gwinn's boots and felt something heavy that moved inside. When the officer looked inside of the boot, he found a pistol. The woman identified the pistol as the weapon with which she had been threatened.

Gwinn was charged with unlawfully possessing both the shotgun and the revolver. The district court granted the motion to suppress the shotgun (found under the couch) and denied the motion to suppress the seizure of the revolver. On appeal, Gwinn argued that the district court applied an incorrect legal standard to justify the trooper's reentry into the trailer to retrieve the boots and shirt and that the plain view doctrine did not justify the warrantless seizure of the handgun. The Fourth Circuit began its analysis by concluding that the initial entry into the trailer after Gwinn's arrest and protective sweep complied with the Fourth Amendment, a point Gwinn did not challenge on appeal.[9] The Fourth Circuit noted that Gwinn successfully challenged the subsequent investigatory search that produced the shotgun and further noted that the issue of that search was not before the Court on appeal. Instead, on appeal, Gwinn maintained "that after the troopers completed the investigatory search and left the trailer in preparation for transporting him to jail, their immediate safety concerns should have been allayed and therefore they were not

---

[9] Of course, in *Gwinn*, the officers knew that there were *real* (not theoretical) people present in the trailer. And officers received reports of a *real* (not hypothetical) threat of danger (involving a firearm) to the woman and child inside of the trailer. These facts are not present in Mr. Cleckley's case.

entitled to reenter the trailer to retrieve Gwinn's clothes without either his permission or a warrant." 219 F. 3d at 331.

In addressing this issue, the Fourth Circuit determined that the district court appropriately concluded that the trooper's reentry was not justified by consent. The Fourth Circuit, however, found that the district court erred by applying a general reasonableness test to justify a warrantless search of the home. Nonetheless, the Fourth Circuit affirmed the denial of the motion to suppress based "on the exigencies created by the substantial risk of injury to Gwinn were he to be transported and processed following arrest without shoes and a shirt and the limited degree of intrusion represented by the reentry and seizure of the boots." *Id.* at 333. In applying a "clothing exigency exception to the warrant requirement," the Fourth Circuit relied on no fewer than five specific facts of Gwinn's case. *Id*. at 333. The Government does not identify those facts for this Court. The factors on which the Fourth Circuit relied are as follows:

> *First*, Trooper Thomas was presented with an objective need to protect Gwinn against the **substantial risk of injury to his feet and of chill in the absence of a shirt**. *Second*, there was **no evidence or even a claim that Trooper Thomas' reasons for reentering the trailer were pretextual**. *Third*, the **intrusion into Gwinn's trailer was slight and temporary**, particularly in light of the fact that the officers had only moments before lawfully been in the trailer to ensure the **safety of Harrah and her baby and had neither completed their business at the site nor left it**. *Fourth*, the intrusion was **strictly limited to the purpose of retrieving shoes and clothing**. *Fifth*, the purpose of the reentry and seizure of the boots was **not to serve a governmental interest, but to ensure Gwinn's reasonable safety while he was in the government's custody**. Indeed, for that reason it is doubtful whether Trooper Thomas' actions in retrieving the boots to hand them to Gwinn would have constituted a "meaningful interference" with Gwinn's possessory interests in the boots so as to even constitute a seizure. *United States v. Jacobsen*, 466 U.S. 109, 113, (1984) ("A'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property").

219 F.3d at 333-34 (emphasis in bold added).

Importantly, the Fourth Circuit "caution[ed] against using a clothing exception  as a cover for entries made for other purposes." *Id*. at 334-35. The Fourth Circuit went even further: "We

must reiterate that an **essential premise** for our application of the exception here is the fact that nothing in the record suggests that Trooper Thomas' reason for the reentry was pretextual or that he acted in bad faith." *Id*. at 335 (emphasis added). The Fourth Circuit also clarified the Government's burden, holding that "in invoking the clothing exception to the warrant requirement, the government bears the burden of demonstrating *particularly* that the arrestee had a *substantial need* for the clothing and that the government's response was *limited strictly to meeting that need*." *Id*. (emphasis added).

The Government's Motion for Reconsideration contains no analysis of the five specific factors the Fourth Circuit relied on in *Gwinn*. The Government makes no mention of the Fourth Circuit's cautionary warning with respect to clothing exigency doctrine. The Government fails to inform this court of what the Fourth Circuit deemed an *essential premise* in its application of the doctrine. And the Government is silent with respect to the Fourth Circuit's analysis of the Government's burden when it seeks to invoke the doctrine at issue. These material deficiencies render the Government's argument (which, as explained above, it has waived) insufficiently developed. The Government's argument is also misleading. The Government argues: "Once Inspector Martin and his arresting team initially entered Cleckley's motel room officers performed a lawful protective sweep of the room just as the officers did in *Gwinn*." (ECF No. 64 at 5.) This argument leaves the misimpression that in *Gwinn*, the officers conducted their protective sweep in connection with the effort to retrieve clothing. That is not the case. In *Gwinn*, the officers had long since completed both a protective sweep and an investigatory search (which produced the suppressed shotgun) at the time the trooper reentered the trailer to retrieve the clothing. *Gwinn* simply does not stand for the proposition that any time clothing exigencies exist, a protective sweep is automatically authorized.

Moreover, *Gwinn* is inapposite. First, there was no objective need to protect Mr. Cleckley from any risk of injury or chill. The Government presented no testimony about any danger on the sidewalk or in the parking lot directly outside of Room 54. Mr. Cleckley was not going to freeze on the morning of April 30, 2024. In fact, members of the arrest team were wearing shorts and t-shirts as seen in this image from Government's Hearing Exhibit 4.



Far from any exigent need to obtain clothing, Inspector Martin testified that "[i]t's not a requirement" to have someone in custody, including Mr. Cleckley, fully clothed to be transported. Tr. at 113. To put a finer point on it, Inspector Martin stated that it was merely "routine" to obtain clothing. *Id*. "Routine" doesn't meet the test of an exigent circumstance.

Second, the clothing rationale is clearly pretextual in this case. The Government in its brief, which was submitted after the Government consulted with witnesses, never argued that the clothing was the reason for going into the hotel room without a warrant. Inspector Martin testified that officers went into the hotel room to make sure there was no one hiding inside of it. After prompting by the Government as to "any other reasons," why he "may" have entered the room, Inspector Martin stated that the team "had to get him dressed" because "[h]e wasn't dressed

12

appropriately to go to jail, to be transported to the detention center." Tr. at 112-113. He did not testify, and the Government did not argue, that entering into the hotel room was done for the sole or even primary purpose of obtaining clothing. Inspector Martin did not testify as to any substantial need for the clothing to protect Mr. Cleckley from any purported danger, or to ensure he didn't freeze (after 9 a.m., in late April, in Upper Marlboro, Maryland). Third, as reflected in the body-worn camera footage presented at the motions hearing, the intrusion into the hotel room was expansive (flipping a mattress, for example), certainly not temporary (lasted for hours, even without a warrant), and was not conducted after officers had already lawfully been present in the room (as was the case in *Gwinn*). Fourth, the intrusion was not strictly limited to retrieving clothing. Officers walked immediately past clothing and went to the bathroom and the mattress. Fifth, the purpose of the entry was to search (unlawfully) for hypothetical hidden people.

The Government presented no evidence that Mr. Cleckley had a substantial need for clothing. The objective footage shows that the officers' actions were not strictly limited towards obtaining clothing. What is clear is that the Government seeks to use *Gwinn* to cover up a warrantless search that the Court has already held to be unlawful under the binding cases on protective sweeps, a line of cases that *Gwinn* did not alter. Under *Gwinn*, the use of obtaining clothing as a pretext, or "second point," to justify a warrantless entry and search is not permissible. Tr. at 176.

Additionally, the Government's citation to Corporal Thomas Rickard's testimony about items allegedly seen in plain view during the initial warrantless search is misleading. Corporal Rickard *did not* go into the room with the initial entry team. Tr. at 83. Corporal Rickard did not see *anything* in plain view during the initial warrantless entry and search precisely because he was *outside of the hotel room*. The Government called one witness who was present for the initial entry

13

into Room 54: Inspector Martin. Inspector Martin testified that the rifle clip underneath the mattress *was not in plain view*. Tr. at 118 (Q: It was not in plain view? A: Correct.). Inspector Martin further testified that Cpl. Rickard "walked in shortly after I walked out." Tr. at 119. Inspector Martin's testimony, in response to a question *from the Government*, debunks the notion that anything incriminating was observed in plain view during the initial warrantless search.

> Q.    Okay.  And after you performed the protective sweep, do you recall telling Task Force Officer Rickard that there were certain items seen in plain view?
>
> A.    Yes.  I would have told him that the magazine was there because that's what I saw.
>
>            **MS. MITCHELL:**  No further questions.  Thank you. [10]

That's what the *only testifying witness* who participated in the initial entry actually saw (and what that same witness told Cpl. Rickard): a magazine that was *not* in plain view. Not scales. Not packaging materials. Not baggies. Not cash. Not anything else.

In sum, the Government's exigent circumstances argument should not be considered because the Government elected not to brief in the issue in the first instance. The Government never cited *Gwinn* in responding to Mr. Cleckley's Motion. The Government never argued anything having to do with exigencies at the hearing. The Government falls far short of establishing clear error. And *Gwinn* does not apply. Officers went into the hotel room to search for hypothetical people. The clothing was an afterthought. The Court has held that no protective sweep was justified. The Government has established no substantial need for the clothing. Nor has the Government shown that law enforcement actions (which included passing directly by clothing to flip a mattress) were strictly limited to obtaining clothing. The Government's recitation of items

---

[10] *See* Tr. at 123.

purportedly in plain view is inconsistent with the testimony of the sole witness who was actually present for the initial warrantless search. The Moton for Reconsideration should be denied.

## IV.    Inevitable Discovery and Independent Source

The Government alleges that this Court committed clear error with respect to the inevitable discovery and independent source doctrines. The Government made the decision not to brief or apply these legal principles in its response to Mr. Cleckley's Motion to Suppress. At the motions hearing, the Government made reference to the inevitable discovery doctrine *for the first time* late in its oral argument when it decided to hand out paper copies of a case it never previously cited to the Court and Mr. Cleckley. Then the Government offered speculation, with no citation to any evidence or legal analysis, that hotel staff could have found the magazine and alleged paraphernalia in the hotel room after Mr. Cleckley's arrest. The Government's invocation of these doctrines, for the first time at oral argument, was procedurally improper. The Government should not get a second bite at the apple. The Government had the opportunity to brief the inevitable discovery and independent source doctrines. It chose not to. Instead, it chose to present undeveloped and unsupported oral arguments, which were rejected. The Government has failed to identify clear error. The Court can and should deny this aspect of the Motion for this reason alone. *See, e.g.*, *United States v. Bell*, No. 4:25cr46, 2025 U.S. Dist. LEXIS 277655, at \*12-13 (E.D. Va. Dec. 8, 2025) (internal citations and quotations omitted) ("After insisting in the briefing that the challenged search was in fact a lawful inventory, the Government invoked the doctrine of inevitable discovery for the first time at the hearing. . . . To begin, the Government's presentation of this argument was procedurally improper. . . . Accordingly, the Court need not consider it.")

Frankly, the Government's arguments on these doctrines in its Motion for Reconsideration are not at all clear and appear to be based, again, on rank speculation (another reason to deny this aspect of the Motion outright).[11] Mr. Cleckley will address the merits, as best he can discern them. The Government says that PGPD officers would have applied for and obtained a warrant to search Room 54 absent any warrantless entry into and search of the hotel room. This argument does not pass muster. PGPD officers were not even on scene at the Bragg Motel at the time of the arrest. They didn't learn about Mr. Cleckley's arrest until after members of the USMS task force alerted them to it. TFO Marron testified that he had no involvement in the April 30 operation related to Mr. Cleckley before the arrest and search. The group messages admitted in Government's Hearing Exhibit 8 corroborate this point. The information provided to PGPD contained alleged observations from the warrantless entry into and search of the hotel room. There is no evidence that PGPD officers were already in the process of applying for a warrant to search Room 54 before the arrest and entry. At that time, PGPD did not know anything about Mr. Cleckley's presence at the hotel.

The Government has identified no evidence in support of its argument. In fact, there would have been no basis to obtain a warrant absent information about the unlawful entry into and search of the hotel room. Moreover, TFO Marron *did not trust* the law enforcement officers who arrested Mr. Cleckley. TFO Marron asked whether it was the same group that had "screwed" TFO Marron's

---

[11] As to both the inevitable discovery and independent source doctrines, the Government bears the burden of proof. *See, e.g.*, *Bell*, 2025 U.S. Dist. LEXIS 277655, at *13 (inevitable discovery); . *United States v. Ventura*, No. WDQ-10-0770, 2013 U.S. Dist. LEXIS 50462, at *67 (D. Md. Apr. 8, 2013) (discussing the Government's burden of proof by a preponderance of the evidence with respect to both the independent source and inevitable discovery doctrines). And the burden is now even higher because the Government must establish that the Court committed clear error in its ruling.

team on a prior occasion. TFO Marron explicitly stated in the group chat that he did not trust those officers. And without any information about items (illegally) found in the hotel room, there would have been no probable cause to support a warrant. What likely would have happened is that the warrant would have been denied for a lack of nexus to criminal activity, just like TFO Marron's initial warrant applications to search Mr. Cleckley's cell phones were denied. (ECF No. 34-3.)

Next, the Government argues that the warrant application set forth probable cause even without considering the magazine because of the mention of other items allegedly found in the hotel room. The Government cites no case in support of this argument. The Court should not consider the Government's unsupported conclusory claim. The Court has already determined that there was no lawful basis for the officers to enter the hotel room without a warrant. That is sufficient to dispatch this argument. Moreover, there is no testimony from any officer who made the initial entry into the hotel room that there was anything incriminating in plain view. The evidence is that Inspector Martin, the sole witness who was part of the initial entry team, saw a magazine that was not in plain view, after he had already violated Mr. Cleckley's Fourth Amendment rights and then flipped a mattress.

Finally, the Government engages in a feat of speculation to argue that the items in the hotel room would have inevitably been discovered by law enforcement because staff members of the Bragg Motel would have found the items and then called the police. There is no evidence to support this argument. The Government did not call any Bragg Motel staff members as witnesses. The Government did not introduce into evidence any Braff Motel policies. The best the Government has to offer is conjecture based on events that occurred 16 months prior, at a different hotel, in a different county, under different circumstances. As the Government well knows, when staff members at the Red Carpet Inn entered Room 217 on December 17, 2022, the room rental had

already expired, and hotel staff members had already made attempts to contact the renter. Indeed, the Government's response to Mr. Cleckley's Motion states that the room was rented through December 16. (ECF No. 40 at 3.) However, as to Room 54 of the Bragg Motel, hotel documents that the Government provided in discovery (reproduced in part in Mr. Cleckley's reply at ECF No. 45 at 5), show that Mr. Cleckley had rented Room 54 through May 3, 2024, days *after* his arrest. The Government is silent as to that material difference between the two events. The Government's speculation does not carry weight and does not meet the burden of proof by a preponderance of the evidence. Nor does it establish clear error. The Court should therefore deny the Motion for Reconsideration.

## CONCLUSION

This Court afforded the parties ample opportunity to brief the issues raised in Mr. Cleckley's Motion to Suppress. The Court set aside an entire day for an evidentiary hearing, which was scheduled well in advance. The Court carefully reviewed the filings, listened to the testimony of the witnesses the Government chose to call, and heard argument. The Court issued a thorough opinion resolving the Motion. Towards the end of its Opinion, the Court noted that "the conduct of law enforcement in this case is sufficiently concerning to the Court that a deterrent is needed, to ensure that such conduct does not occur again and jeopardize future criminal prosecutions."[12] (ECF No. 61 at 18.) As the facts of this case bore out in briefing and at a lengthy hearing, these concerns are well-founded. The conduct of law enforcement violated Mr. Cleckley's constitutional rights. The Government's apparent desire to win this case cannot change that. The Government

---

[12] And at the motions hearing, the Court repeatedly indicated that it found aspects of this case troubling or concerning. *E.g.*, Tr. at 95, 97, 184, 185, 186

has identified no clear error on the part of this Court. The Motion for Reconsideration should be denied.

Respectfully submitted,

_____/s/_____
John M. McKenna
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044
jmckenna@brennanmckenna.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of June, 2026, the foregoing was served on all parties via ECF.

_____/s/_____
John M. McKenna